[No. H034335. Sixth Dist. Apr. 1, 2010.]

CALIFORNIA AMERICAN WATER, Plaintiff and Respondent, v.
CITY OF SEASIDE et al., Defendants and Respondents;
MONTEREY PENINSULA WATER MANAGEMENT DISTRICT,
Intervener and Appellant.

COUNSEL

Shute, Mihaly & Weinberger, Ellison Folk, Amanda R. Garcia; Delay & Laredo and David C. Laredo for Intervener and Appellant.

California Environmental Law Project and Laurens H. Silver for Sierra Club as Amicus Curiae on behalf of Intervener and Appellant.

Carrie Lynn Gleeson, Timothy J. Miller; Diepenbrock Harrison, Andrea A. Matarazzo, Jon D. Rubin and Valerie C. Kincaid for Plaintiff and Respondent.

Brownstein, Hyatt, Farber, Schreck, Russell M. McGlothlin; Perry & Freeman and Donald G. Freeman for Defendant and Respondent City of Seaside.

Sheri L. Damon for Defendant and Respondent Security National Guaranty.

Heisinger, Buck & Morris and James G. Heisinger, Jr., for Defendant and Respondent City of Sand City.

## OPINION

**ELIA, J.**—The Monterey Peninsula Water Management District (MPWMD or the District) appeals from an order clarifying and enforcing a prior decision, which had defined the rights of parties interested in the production of groundwater from the Seaside Basin. The MPWMD contends that the court exceeded its jurisdiction and violated the doctrine of separation of powers by restricting the District's authority to require environmental review of subsequent permit applications by the water-producing parties. We find no error and will therefore affirm the order.

### Background

The MPWMD was created in 1977 with the enactment of the Monterey Peninsula Water Management District Law. (Stats. 1977, ch. 527, §1, p. 1672, 72B West's Ann. Wat.—Appen. (1995 ed.) §§ 118-1, 118-101.)[1] In establishing the District, the Legislature recognized the shortage of water resources in the Monterey Peninsula area and declared the need for "integrated management of ground and surface water supplies, for control and conservation of storm and wastewater, and for promotion of the reuse and reclamation of water." (§ 118-2.) Toward these objectives of conservation, the MPWMD was empowered to store water, appropriate water rights, control waste and exportation, and maintain proceedings to prevent interference with beneficial water use. (§ 118-328.) Its authority includes the right to approve the establishment or expansion of water distribution systems. (§ 118-363.)

Respondent California American Water (Cal-Am) is an investor-owned public utility which extracts groundwater from the Seaside Basin and delivers

---

[1] Further unspecified section references are to the Water Code Appendix.

it to locations in its service area in Monterey County. Security National Guaranty, Inc. (SNG), is a real estate developer which owns land overlying the basin and produces groundwater from it. Although Cal-Am originally named SNG as a defendant in the action that gave rise to the motion at issue, the two companies have taken the same position in the motion proceedings and on appeal from the resulting order.

## 1. *The 2007 Amended Decision and Order*

The controversy leading to the challenged order centers on water distribution from the Seaside Basin, which underlies the cities of Seaside, Sand City, Monterey, and Del Rey Oaks, as well as portions of unincorporated areas. On August 14, 2003, Cal-Am sought a declaration of rights among the parties interested in the production and storage of groundwater from the Seaside Basin. Cal-Am further requested an injunction "requiring the reasonable use and coordinated management of groundwater within the Seaside Basin," along with the appointment of a watermaster to administer the resulting decision. The complaint named multiple defendants, including respondents City of Seaside, City of Sand City (Sand City), and SNG. The MPWMD intervened, resulting in multiple cross-complaints among the parties and an appearance by Sierra Club as amicus curiae in support of the District.[2] Seaside, Sand City, and other "Water User Defendants" joined Cal-Am in requesting approval of a stipulated judgment, which was opposed by the MPWMD and another intervener, the Monterey County Water Resources Agency.

Exercising its authority under article X, section 2 of the California Constitution, the superior court adjudicated the rights of the parties. In its amended decision on February 9, 2007, the court partially rejected the stipulation and set forth its findings regarding the status and permissible use of the Seaside Basin. The court recognized that groundwater production from the basin had exceeded its "Natural Safe Yield"[3] in each of the preceding five years, which could lead to deleterious intrusion of seawater in the area. It therefore created and defined the position of "Watermaster," a 13-member group, and it adopted a "Physical Solution" to provide coordinated management of the groundwater resources and thereby "maximize the reasonable and beneficial use of [w]ater resources" in a manner consistent with the California Constitution and the public's interest in a maximum natural yield. The court's specifically stated objective was "to ultimately reduce the drawdown of the

---

[2] Sierra Club has continued in that role, having filed an amicus curiae brief in this court.

[3] "Natural Safe Yield" was defined as "the quantity of Groundwater existing in the Seaside Basin that occurs solely as a result of Natural Replenishment."

aquifer to the level of the Natural Safe Yield; to maximize the potential beneficial use of the Basin; and to provide a means to augment the water supply for the Monterey Peninsula." The Watermaster's function was to oversee the process and implement regulations to ensure compliance with the physical solution.

The court set forth a method of calculating the amount each producer was permitted to extract from the basin, subject to a determination by the Watermaster and the court that continued pumping at the designated amount would cause "Material Injury to the Seaside Basin or to the Subareas or will cause Material Injury to a Producer due to unreasonable pump lifts." In the event of such injury, the court specified the method of calculating the "modified Operating Yield" and concomitant revised production allocations. Toward the goal of augmenting the total yield of the basin, the court's decision provided for artificial means (i.e., recapture, storage, and recovery), transfer of allocations, utilization of reclaimed water for irrigation, and specified schedules of reduction in extractions when required by the court, the Watermaster, or "other competent governmental entity." The court further ruled that each producer was "prohibited and enjoined from [p]roducing [g]roundwater from the Seaside Basin except pursuant to a right authorized by this decision, including Production Allocation, Carryover, Stored Water Credits, or Over-Production subject to the Replenishment Assessment."[4] If Cal-Am were to intrude on a water defendant's production allocation, the decision spelled out the substantive and procedural consequences of the harm caused by the intrusion.

Addressing the MPWMD's complaint in intervention, the court rejected the District's request to be the Watermaster in favor of the 13-member collaborative group. Specifically addressing the MPWMD's assertion of exclusive authority to regulate groundwater pumping under the separation of powers doctrine, the court pointed out that the District itself had requested a physical solution, thereby conceding that the court had superior authority to regulate the use of the basin. Water Code section 10753, the court noted, precluded any local agency's adoption and implementation of groundwater management plans to the extent that its service area is already managed by "a court order,

---

[4] "Carryover" was defined as "that portion of a [p]arty's Production Allocation that is not [e]xtracted from the Basin during a particular Water Year." "Over-Production" referred to either extraction exceeding the Natural Safe Yield or extraction in excess of an individual producer's base water right. "Replenishment Assessment" meant an assessment levied by the Watermaster based on the amount of overproduction by any party in the previous year. The amount of the assessment was to be determined by the cost of artificial replenishment with nonnative water sufficient to offset the degree of overproduction.

judgment, or decree."[5] Accordingly, "the District will not be able in the future to adopt a Groundwater management plan for the Seaside Basin. Clearly the [L]egislature contemplated that courts had the power to develop management plans for aquifer management even if a water management district already existed in a geographical area." The court acknowledged that "the District possesses certain authority, which it is free to exercise according to the legislative mandate which created it. However, it is apparent [that] the [L]egislature did not intend that all of the powers it granted to the District be held exclusively by the District, [or] else it would not at a later time have created the Monterey County Water Resources Agency and endowed it with many of the powers granted to the MPWMD." Should the powers of the Watermaster overlap those of the MPWMD, the court would, under its retained jurisdiction, be in a position to resolve any resulting conflict. One conflict already asserted by the District was the interference with its authority by the Watermaster "regarding maintenance and modification of the Operating Safe Yield."[6] The court rejected this assertion, finding that its decision did not conflict with "any procedure or plan currently in place by the District to establish an Operating Yield for the Basin."

Finally, the court specified the means by which the parties could obtain future adjudication of their rights. De novo review of Watermaster decisions, for example, was to be pursued within 30 days by noticed motion. Of particular relevance to this appeal was the court's reservation of jurisdiction: "Full jurisdiction, power and authority are retained by and reserved by the Court upon the application of any [p]arty or by the Watermaster, by a noticed motion to all [p]arties, to make such further or supplemental orders or directions as may be necessary or appropriate for interpretation, enforcement, or implementation of this Decision." The court did not purport to retain authority to adjust any producer's base water right or production allocation, except upon intervention by a new party and then only under certain

---

[5] Subdivision (a) of Water Code section 10753 provides: "Any local agency, whose service area includes a groundwater basin, or a portion of a groundwater basin, that is not subject to groundwater management pursuant to other provisions of law or a court order, judgment, or decree, may, by ordinance, or by resolution if the local agency is not authorized to act by ordinance, adopt and implement a groundwater management plan pursuant to this part within all or a portion of its service area."

[6] "Operating Safe Yield" was defined as "the maximum amount of [g]roundwater resulting from Natural Replenishment that this Decision, based upon historical usage, allows to be produced from each Subarea for a finite period of years" without material injury. The decision established the operating yield for each target area, including the basin, to be maintained for three years or until the Watermaster (with the court's concurrence) determined that continued pumping at that level would cause material injury to the basin, to one of the two affected subareas, or to a producer. The Watermaster was then to determine a modified operating yield in accordance with specified principles, procedures, and criteria.

conditions. As to other remedies between the parties, the court stated that "Nothing in this Decision shall either expand or restrict the rights or remedies of the [p]arties concerning any subject matter that is unrelated to the use of the Seaside Basin for Extraction and/or Storage of Water as allocated and equitably managed pursuant to this Decision."

## 2. The 2009 Order

On September 15, 2008, respondents Cal-Am and SNG applied to the MPWMD for a permit allowing Cal-Am to pump water from the Seaside Basin in order to serve a proposed project, the Monterey Bay Shores Ecoresort. The resort site, comprising just over 39 acres, was to encompass a 161-room hotel, 226 condominium units, a restaurant, a spa, and conference facilities, in addition to outdoor areas and parking. Cal-Am sought to extract up to 90 acre-feet per year for distribution to the resort site. Cal-Am and SNG represented that no water would be removed from any source other than the Seaside Basin. The application was also submitted to the Watermaster, which determined that the proposal was consistent with the superior court's 2007 amended decision.

The Board of Directors of the MPWMD (Board) conducted hearings on the application between November 2008 and February 2009, and voted four to three to deny the application until further environmental review could be obtained pursuant to the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.). On March 26, 2009, the Board similarly voted to adopt findings of denial. The Board majority specifically directed the MPWMD to prepare a new environmental impact report (EIR) focused on the potential impacts of the project on the Carmel River as well as on the Seaside Basin. Some of the Board's concerns were based on issues raised after January 2009, when Sand City had considered a prior EIR. The new EIR was also to evaluate possible alternative sources of water and mitigation measures that would be less environmentally damaging.

In April 2009 SNG, joined by Cal-Am and Sand City, moved in superior court for an order enforcing or clarifying the court's February 9, 2007 amended decision. SNG asserted that by revising pumping allocations the MPWMD had ignored the physical solution, had disregarded the Watermaster's jurisdiction, and had improperly purported to reexamine factual issues adjudicated in the amended decision. SNG sought declaratory and injunctive relief to invalidate the Board's denial of the permit. Cal-Am added the argument that the MPWMD had exceeded its statutory authority under the Monterey Peninsula Water Management District Law (Stats. 1977, ch. 527, § 1, p. 1672, 72B West's Ann.—Wat. Appen. (1995 ed.) ch. 118, p. 401.) Seaside directly

addressed the concerns identified by the MPWMD and emphasized that the Board's findings went "too far" by interfering with the physical solution established by the court's amended decision. Seaside urged the court to issue declaratory relief to clarify the findings and rationale in the amended decision.

In its opposition, the MPWMD argued that SNG's protest should have been made by a petition for a writ of administrative mandate under Code of Civil Procedure section 1094.5, and that judicial review was limited to preserve the separation of powers. It pointed out that its denial had been made without prejudice, and it argued that as a responsible agency it was required under CEQA to review projects that might have significant negative effects on the environment. The District further maintained that it had properly exercised its statutory authority and duty, and that any doubts should be resolved in favor of the Board's findings.

At the hearing and in its ensuing order, the superior court explained its concern for the integrity of the basin in the implementation of the physical solution. With that concern the court scrutinized "[a]ny attempts by any agency or organization to impose obligations on the use of Basin water rights." More specifically, the court found, although the MPWMD had authority to issue water distribution permits, it "cannot exercise that authority in contravention of the Physical Solution imposed by the Amended Decision for management of the Basin." Accordingly, the court ruled that "the Physical Solution governs the environmental aspects of Seaside Basin [groundwater] usage, and . . . no [p]arty to this adjudication can require environmental review under [CEQA] with regard to such usage. . . . [¶] To the extent that the findings of the MPWMD denying the application of SNG and [Cal-Am] are inconsistent with the principles set forth hereinabove, and in particular Findings 17 through 21[7] and specifically to the extent that any of the

---

[7] Finding 17 reflected the Board's determination that an additional EIR ("Subsequent EIR") was needed to determine whether approval of the application "could result in potential near-term adverse impacts to the Seaside Groundwater Basin . . . . A related issue is the timing and implementation of 10% triennial reductions in production for Standard Producers in order to attain the Court-ordered 'natural safe yield,' and the cumulative effect of [Cal-Am] service to [the resort] in light of these other actions." Finding 18 pertained to the Board's determination that alternative sources of basin water "could possibly be available to enable SNG to exercise its water rights in a less environmentally damaging manner," thus contributing to the need for a subsequent EIR. Finding 19 generally asserted the need for a "Subsequent EIR" "in order to make an informed decision on the environmental effects of the proposed project as it relates to water supply," by consolidating all environmental information at hand into one document to which the public would be entitled to comment before a decision was made. Finding 20 expressed the Board's opinion that approval of the application "could involve new significant environmental effects or a substantial increase in the severity of previously identified significant effects due to a change in the project from an on-site well supply to the [Cal-Am] system as the source of supply." Likewise, finding 21 suggested the possibility of

findings reference a need for CEQA review of the impact of the application on Seaside Basin production the findings impinge upon the decision and cannot stand."

The court therefore ordered the MPWMD to set aside its denial of the permit application, rehear the matter, and reconsider the application in light of the court's ruling. This appeal followed.

## Discussion

The central issue in this appeal is whether the February 9, 2007 amended decision encompassed the issues addressed in the MPWMD's action. The MPWMD argues that the court's review power was limited to a determination of whether the District's findings were supported by substantial evidence. By entertaining the motion for declaratory relief, the MPWMD contends, the court exceeded its jurisdiction and violated the doctrine of separation of powers. The MPWMD further renews its assertion that the motion for declaratory relief was procedurally improper, as the request should have been made by a petition for administrative mandate under Code of Civil Procedure section 1094.5 (hereafter section 1094.5). The MPWMD insists that a section 1094.5 challenge is "sole remedy for denial of a permit."

## 1. *Section 1094.5 Challenge*

The MPWMD overstates the Code of Civil Procedure section 1094.5 requirement as applied to the primary issues before the court. As the court noted in responding to this argument, the question addressed in SNG's motion was whether the District's decision involved subject matter already covered by the February 2007 order and reserved for future adjudication. Consideration of the motion required the court to revisit its prior ruling and clarify its scope; it did not call for a ruling on the merits of the underlying application.

The cases cited by the District are not helpful. In *State of California v. Superior Court* (1974) 12 Cal.3d 237 [115 Cal.Rptr. 497, 524 P.2d 1281], for example, the denial of the developers' permit was a discretionary decision by the commission which was reviewable only by writ of mandate; thus, whether the permit should have been granted (as well as the jurisdiction of the commission to hear the appeal) could not be reviewed in a declaratory relief

---

"new significant environmental effects or a substantial increase in the severity of previously identified significant effects due to a change in the circumstances (setting) under which the project is undertaken . . . ."

action. (*Id.* at p. 249; see also *Briggs v. City of Rolling Hills Estates* (1995) 40 Cal.App.4th 637, 644–649 [47 Cal.Rptr.2d 29] [action to challenge the merits of city council's decision].) Here, by contrast, the dispositive grounds of the motion were directed at the asserted interference with the reserved jurisdiction of the court, not the evidentiary support for the Board's decision or the wisdom of its reasoning in refusing to grant the permit application. The resulting order did not purport to dictate the issuance of the permit but only remanded for reconsideration and a result consistent with the physical solution already in place.

For the same reason, the absence of an administrative record does not invalidate the present order. While the court did note that the Carmel River was not a prospective source of production, that observation was not necessary for the court to reach its conclusion. The key portion of the order is not a resolution of factual disputes or an adjudication of rights under the separation of powers doctrine, but an interpretation of the court's prior amended decision. The court was asked to determine whether the District had overstepped its authority by reaching a decision on issues that were within the reach of the physical solution and the court's reserved jurisdiction. Whether that determination was correct is the dispositive question in this appeal.

## 2. *Conflict Between the Findings of Denial and the Physical Solution*

■ A physical solution is an equitable remedy designed to alleviate overdrafts and the consequential depletion of water resources in a particular area, consistent with the constitutional mandate to prevent waste and unreasonable water use and to maximize the beneficial use of this state's limited resource. (Cal. Const., art. X, § 2.) Courts are vested with not only the power but also the affirmative duty to suggest a physical solution where necessary, and they have "the power to enforce such solution regardless of whether the parties agree." (*City of Lodi v. East Bay Mun. Utility Dist.* (1936) 7 Cal.2d 316, 341 [60 P.2d 439].) "It must be remembered that in this type of case the trial court is sitting as a court of equity, and as such, possesses broad powers to see that justice is done in the case. The state has a definite interest in seeing that none of the valuable waters from any of the streams of the state should go to waste. Each case must turn on its own facts, and the power of the court extends to working out a fair and just solution, if one can be worked out, of those facts." (*Rancho Santa Margarita v. Vail* (1938) 11 Cal.2d 501, 560–561 [81 P.2d 533].)

The solution must not, of course, unreasonably or adversely affect the existing legal rights and respective priorities of the parties. (Cf. *City of*

*Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1243–1244, 1250–1251 [99 Cal.Rptr.2d 294, 5 P.3d 853].) But a trial court nonetheless has discretion to implement its physical solution within the bounds of its authority. (*Id.* at p. 1256.)

We discern no error in the court's ruling, even if we apply a de novo standard of review, as urged by the MPWMD. Examination of the Board's "Findings of Denial," particularly findings 17 through 21 (the focus of the superior court's order) reveals overlap with the court's 2007 physical solution. Finding 17 directly applied to the Seaside Basin; it declared the need for an EIR to address the Board's concern that "approval of the application could result in potential near-term adverse impacts to the Seaside . . . Basin." Finding 18 also pertained to the basin, in expressing the Board's view that "alternative sources of Seaside Basin water could possibly be available to enable SNG to exercise its water rights in a less environmentally damaging manner." Finding 19 stated more generally the Board's concern for environmental harm. The court's order, however, does not entirely invalidate finding 19 and its concomitant call for a subsequent EIR, but only disapproves it to the extent that it conflicts with the physical solution—that is, to the extent that it "reference[s] a need for CEQA review of the impact of the application *on Seaside Basin production.*" (Italics added.) The same is true of findings 20 and 21.

We agree with the court that these findings contravened the 2007 amended decision to the extent that they purported to adjudicate water rights in the Seaside Basin. In adopting the physical solution the court expressly defined it as "the efficient and equitable management of Groundwater resources within the Seaside Basin." It established the operating yield and delineated the rights of the producing parties, including calculation of each party's production allocation for the succeeding years. The court acted within its jurisdiction and properly exercised its discretion in adhering to its prior rulings to minimize conflict with and frustration of the physical solution. In so doing, it facilitated both the exercise of the parties' water rights and the beneficial use of the Seaside Basin.

The MPWMD's argument that the order violated the separation of powers doctrine is not well taken. The 2007 decision addressed a similar argument, rejecting the District's assertion that appointment of a Watermaster other than itself would interfere with the separation of powers. In so ruling, the court pointed to Water Code section 10753[8] and ruled that the District would "not

---

[8] Subdivision (a) of Water Code section 10753 provides: "Any local agency, whose service area includes a groundwater basin, or a portion of a groundwater basin, that is not subject to groundwater management pursuant to other provisions of law or a court order, judgment, or decree, may, by ordinance, or by resolution if the local agency is not authorized to act by

be able in the future to adopt a Groundwater management plan for the Seaside Basin." The present order reaffirms that prior statement.

We further see no improper restriction of the MPWMD's discretion. The court's order clearly acknowledged that the District had the authority to issue water distribution permits, and it accommodated the District's ability to examine other environmental effects of SNG's proposal. Nevertheless, the court explained, the District's power must not be used in a way that conflicts with the provisions of the physical solution and thereby disrupts the carefully established groundwater production rights of the parties to that solution. The court did not overturn the MPWMD's decision in every respect, as the District appears to suggest, but only identified the areas in which the Board had attempted to take on issues reserved for resolution by the court or the Watermaster. Accordingly, the court properly directed the District to reconsider its findings in a manner consistent with the physical solution.

The MPWMD maintains, however, that the order obstructed its effort to control the parties' use of water from the Carmel River. The record does not support this position. At the hearing the court explicitly acknowledged that the District, not the court, had jurisdiction to require CEQA review to the extent that potential impacts on Carmel River water usage existed. The only ostensible limitation expressed by the court was in agreeing with Seaside that CEQA review is not compelled based solely on the District's concern about commingling of water and storage from different sources; any "issues concerning the source of water molecules as opposed to an accounting of water quantity are irrelevant." More specifically, any commingling that would occur from a contemplated wheeling arrangement between the producers would not "transmute Carmel River water into Seaside Basin water, nor Seaside Basin water into Carmel River water." Thus, the court explained, "MPWMD has authority to require an accounting of water quantity to satisfy itself that no Carmel River water is being used in the project at hand, but it cannot make environmental decisions based on the mere storage of water from two sources."[9] The court's careful wording of its ruling left ample room for the District's exercise of its authority under the applicable constitutional and statutory mandates. In the court's findings and remand order, limited in scope as they are, no error appears.

---

ordinance, adopt and implement a groundwater management plan pursuant to this part within all or a portion of its service area."

[9] This accommodation of the District's proposed review of potential Carmel River impacts undermines Sierra Club's amicus curiae position, which assumes that adverse impacts on the Carmel River are likely and that the order precludes such review.

*Disposition*

The order is affirmed.

Rushing, P. J., and Premo, J., concurred.

A petition for a rehearing was denied April 26, 2010.