[No. E049651. Fourth Dist., Div. Two. Nov. 22, 2010.]

CHERRY VALLEY PASS ACRES AND NEIGHBORS et al., Plaintiffs and Appellants, v.
CITY OF BEAUMONT, Defendant and Respondent;
SUNNY-CAL EGG & POULTRY COMPANY, Real Party in Interest and Respondent.

318

322

**COUNSEL**

Rogers Joseph O'Donnell, Robert C. Goodman, Ann M. Blessing and D. Kevin Shipp for Plaintiffs and Appellants.

Aklufi & Wysocki and Joseph S. Aklufi for Defendant and Respondent.

Best Best & Krieger, Michelle Ouellette and Fernando Avila for Real Party in Interest and Respondent.

**OPINION**

**KING, J.—**

## I. INTRODUCTION

Defendant City of Beaumont (the City) approved a specific plan, the Sunny-Cal Specific Plan (the SCSP or project), to build 560 residential units on a 200-acre site long used for agricultural purposes and located in an unincorporated area north of the City known as Cherry Valley. In August 2007, the City certified an environmental impact report (EIR) and adopted a statement of overriding considerations for the SCSP pursuant to the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.),[1] and took related actions approving the SCSP. Plaintiffs Cherry Valley Pass

---

[1] All further statutory references are to the Public Resources Code unless otherwise indicated.

Acres and Neighbors and Cherry Valley Environmental Planning Group petitioned the trial court for a writ of mandate setting aside the City's certification of the EIR, adoption of the statement of overriding considerations, and related actions approving the project. The trial court denied the petition, and plaintiffs appeal.

Plaintiffs claim the EIR is legally inadequate as an informational document and the City therefore abused its discretion in certifying it because it failed to properly address the project's significant impacts on area water supplies and agricultural land uses. They first claim the EIR relied upon an improper baseline or environmental setting in assessing the project's impacts on local and regional water supplies and also failed to demonstrate a reasonable likelihood the project would have sufficient water supplies over the long term. Second, they claim the EIR failed to adequately consider mitigation measures and alternatives for reducing the project's impacts on agricultural land uses. Third, and finally, they claim the findings the City made in adopting the statement of overriding considerations are not supported by substantial evidence. We find each of these claims without merit and affirm the judgment denying the petition.

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

Cherry Valley is an unincorporated area of Riverside County located north of the City and east of Interstate 10 in the San Gorgonio Pass area. The 200-acre SCSP site is in the western portion of Cherry Valley, and consists of rolling terrain with elevations ranging from 2,400 to 2,600 feet above mean sea level. The SCSP site is roughly rectangular in shape and is bordered by Cherry Valley Boulevard to the north, Brookside Avenue to the south, and Beaumont Avenue to the east. A 631-acre area of Cherry Valley with rural residences, livestock pens, outbuildings, and small farm/ranch operations is located east of the SCSP site.

Beginning in the early 1960's through late 2005, members of the Manheim family, through their company, real party in interest Sunny-Cal Egg & Poultry Company (Sunny-Cal), operated an egg farm on the 200-acre SCSP site. The egg farm housed over 1.5 million chickens and supported over 100 structures, mostly chicken coops. Sunny-Cal closed the egg farm in late 2005 after determining it was no longer economically feasible. Before 1959, the 200-acre project site was used for low-intensity agricultural purposes.

---

[2] The facts are drawn from the administrative record before the City at the time it certified the EIR, adopted the statement of overriding considerations, and took the related actions approving the project in August 2007. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 421 [53 Cal.Rptr.3d 821, 150 P.3d 709] (*Vineyard Area Citizens*).)

During the early 1950's, a professional wrestler known as "Gorgeous George" purchased a house and began operating a small turkey ranch on the SCSP site, just east of the portion of the site where Sunny-Cal later operated the egg farm. Much of the area north of the project site and north of Cherry Valley Boulevard consists of a 240-acre area known as the "Danny Thomas Ranch" and includes a home once owned by the famous producer, actor, and comedian.

As finally approved in August 2007, the 200-acre SCSP is a smaller version of a larger scale SCSP that Sunny-Cal proposed in December 2004. As originally proposed, the SCSP was to encompass 323.3 acres, including approximately 120 acres of the Danny Thomas Ranch, and was to include 110,000 square feet of commercial retail and service properties and 907 residential units. The 323.3-acre project area, together with the adjacent 631-acre area of Cherry Valley east of the project area, were to be annexed to the City's sphere of influence. In December 2004, a notice of preparation was issued for the original SCSP and the annexation. In early 2005, the draft EIR was circulated for the original SCSP and the annexation.

In July 2005, the City's planning commission held a public hearing and suggested changes to the project, principally to reduce its size and scope. The original SCSP was then modified to eliminate all commercial properties and higher density residential units, to reduce the number of residential units from 907 to 597, and to exclude the 120-acre portion of the Danny Thomas Ranch, thus reducing the size or footprint of the SCSP from 323.3 to 200 acres. Further, in order to coordinate land uses on the 200-acre SCSP site with development in the 631-acre area east of the project site, a community plan, the North Brookfield Community Plan, was proposed for the entire 831-acre area, and the sphere of influence was revised to include this expanded area.

Riverside County's general plan and zoning guidelines allowed only one residence to be built on one acre in the 831-acre area, but the North Brookfield Community Plan envisioned that the 831-acre area would include as many as 1,543 residential units, with 597 in the 200-acre SCSP. The 597 units were to be built on 158.9 "net acres," with landscape buffers, parks, roads, trails, paseos, and open space acres constructed on the other portions of the 200-acre SCSP area. The draft EIR was revised to reflect these changes and was recirculated in May and June 2006. The revised EIR assessed the environmental impacts of the revised 200-acre SCSP on a project level and the impacts of the newly proposed North Brookfield Community Plan on a programmatic level.

According to the revised EIR, the area surrounding the 200-acre SCSP site and proposed North Brookfield Community Plan, or the entire expanded

sphere of influence area, was undergoing substantial growth and development. The 631-acre portion of the North Brookfield Community Plan consisted mostly of long-vacant residential lots and "dozens" of parcels owned by "dozens" of individuals, but the Beaumont Unified School District was building a high school on 50 acres in the southwest portion of the 631-acre area. Two new subdivisions with approximately 2,000 homes were under construction southeast of the 200-acre SCSP site within the existing boundaries of the City. A PGA golf course and several more residential developments in various stages of development, including a proposed Oak Valley Specific Plan with approximately 6,000 residential units, was located across Interstate 10 and west of the SCSP site. The 120-acre portion of the Danny Thomas Ranch in the original SCSP had been sold and was proposed to be annexed to the City of Calimesa and developed for residential uses. The revised EIR concluded that the Cherry Valley community had "supported mainly rural and agricultural uses for many years," but it and surrounding communities, including the City, were "experiencing growth pressure from new homes and businesses."

The City requested and received comments on the revised EIR and addressed these and other comments in the final EIR, issued in May 2007. Additional comments were later received and addressed in June 2007. Plaintiffs and persons living in and around Cherry Valley submitted various letters criticizing the EIR's analysis of the project's impacts on area water supplies and agricultural resources.

At a public hearing in July 2007, the city council directed the City's staff and Sunny-Cal to abandon the North Brookfield Community Plan and to make additional changes to the SCSP. The North Brookfield Community Plan was then abandoned, and the SCSP was amended to reduce the number of its residential units from 597 to 560. In August 2007, the City certified the EIR, adopted the statement of overriding considerations, and took additional actions in approving the 200-acre SCSP (the project approvals). These included the annexation of the 200-acre SCSP site into the City and the amendment of the City's general plan to include the 200-acre SCSP site. In September 2007, plaintiffs petitioned the trial court for a writ of mandate setting aside the City's actions. The trial court denied the petition, and plaintiffs appealed.

### III. STANDARDS OF REVIEW

In reviewing a writ petition challenging the legality of a lead agency's actions under CEQA, our role is the same as the trial court's. We review the agency's actions, not the trial court's decision, and we apply the same standards of review the trial court applied. (*Vineyard Area Citizens, supra,* 40

Cal.4th at p. 427.) Our inquiry is limited to whether (1) substantial evidence supports the agency's factual determinations, and (2) the agency proceeded in the manner required by law. (§§ 21168, 21168.5; *Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 705 [58 Cal.Rptr.3d 102] (*Woodward Park*).) The agency abuses its discretion in certifying an EIR as complying with the requirements of CEQA if substantial evidence does not support the agency's factual determinations or if the agency has not proceeded in the manner required by law. (§ 21168.5; *Vineyard Area Citizens, supra*, at p. 426.)

We apply the substantial evidence standard of review to the agency's factual determinations. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) For purposes of CEQA, substantial evidence "means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Cal. Code of Regs., tit. 14, § 15384, subd. (a) (the Guidelines).)[3] "Argument, speculation, unsubstantiated opinion or narrative, [or] evidence which is clearly erroneous or inaccurate . . . does not constitute substantial evidence." (§ 15384, subd. (a).)

By contrast, questions concerning the proper interpretation or application of the requirements of CEQA are matters of law. (See *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 118 [104 Cal.Rptr.2d 326] (*Save Our Peninsula*).) As a matter of law, CEQA requires that an EIR include detailed information concerning, among other things, the significant environmental effects of the project under consideration. (§§ 21100, 21100.1.) When the informational requirements of CEQA are not met but the agency nevertheless certifies the EIR as meeting them, the agency fails to proceed in a manner required by law and abuses its discretion. (*Save Our Peninsula, supra*, at pp. 117–118.) " 'The EIR is the heart of CEQA,' and the integrity of the process is dependent on the adequacy of the EIR. [Citations.]" (*Ibid.*)

The EIR is presumed legally adequate, however (*Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 740 [22 Cal.Rptr.2d 618]; § 21167.3), and the agency's certification of the EIR is presumed correct (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530 [78 Cal.Rptr.3d 1]). Persons challenging the EIR therefore bear the burden of proving it is legally inadequate and that the agency abused its

---

[3] All references to the Guidelines are to the state CEQA guidelines. (Cal. Code Regs., tit. 14, § 15000 et seq.) The Guidelines are binding on all public agencies in California in implementing the provisions of CEQA. (Guidelines, §§ 15000–15001.)

discretion in certifying it. (*Ibid.*; *Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners, supra*, at p. 740.)

■ In reviewing an agency's actions under CEQA, we must bear in mind that "the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 [253 Cal.Rptr. 426, 764 P.2d 278].) "The EIR is the primary means of achieving the Legislature's considered declaration that it is the policy of this state to 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.' [Citation.] . . . An EIR is an 'environmental "alarm bell" ' whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.' [Citations.] The EIR is also intended 'to demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.' [Citations.] Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citations.] The EIR process protects not only the environment but also informed self-government." (*Id.* at p. 392.)

■ Indeed, " '[t]he ultimate decision of whether to approve a project, be that decision right or wrong, is a nullity if based upon an EIR that does not provide the decision-makers, and the public, with the information about the project that is required by CEQA.' [Citation.] The error is prejudicial 'if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.' [Citation.]" (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 721–722 [32 Cal.Rptr.2d 704].) "In other words, when an agency fails to proceed as required by CEQA, harmless error analysis is inapplicable. . . . [I]n such cases, the error is prejudicial. [Citations.]" (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 946 [91 Cal.Rptr.2d 66].)

We must also bear in mind that we do not "pass upon the correctness" of the EIR's environmental conclusions, but only its sufficiency as an informative document. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161] (*Goleta Valley*).) "We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. . . . We may not, in sum, substitute our judgment for that of the people and their local

representatives. We can and must, however, scrupulously enforce all legislatively mandated CEQA requirements." (*Ibid.*; see *Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1447 [70 Cal.Rptr.3d 59] [Fourth Dist., Div. Two] (*Save Round Valley*).)

## IV. ANALYSIS/WATER SUPPLY IMPACTS

### A. *Background*

#### 1. *The Beaumont Basin*

The SCSP area overlies an extensive groundwater basin known as the Beaumont Basin. The Beaumont Basin is the "largest single source" of water from which several water districts in the San Gorgonio Pass area, including the Beaumont Cherry Valley Water District (the BCVWD), the Yucaipa Valley Water District, the Cabazon Water District, and the South Mesa Water Company, draw water to serve their customers. The BCVWD supplies domestic and irrigation water to the City and surrounding communities.

During the mid-1960's, the United States Geological Survey estimated that the Beaumont Basin held 1.1 million acre-feet of groundwater at a depth of 1,000 feet below ground surface.[4] The United States Geological Survey's estimate formed the basis of a general consensus that the base of usable water in the Beaumont Basin was at 1,000 feet below ground surface. More recently, the BCVWD drilled a test well to a depth of 1,500 feet below ground surface, and results suggested that "high quality groundwater" existed in "large quantities" below 1,000 feet below ground surface. According to the BCVWD, other deep wells drilled by Sunny-Cal, the Southern California Professional Golfers Association, and others indicated this deep water source was "relatively wide spread" in the Beaumont Basin.

During the years it operated the egg farm, Sunny-Cal pumped water directly from the Beaumont Basin, using wells on the 200-acre SCSP site, for use in operating the egg farm. Between 1997 and 2001, Sunny-Cal used an average of 1,340 acre-feet per annum (afa) of Beaumont Basin groundwater in operating the egg farm. After the egg farm ceased operating in late 2005, Sunny-Cal began using the project site for cattle ranching and feed crop operations and used far less water, around 50 afa. In order to secure water for the SCSP, the SCSP provides it is to be annexed to the service area of the BCVWD.

---

[4] An acre-foot is 43,560 cubic feet, or the quantity of water required to cover an acre of land to a depth of one foot. (*Brydon v. East Bay Mun. Utility Dist.* (1994) 24 Cal.App.4th 178, 182, fn. 1 [29 Cal.Rptr.2d 128].)

## 2. The 2004 Adjudication and Judgment

In 2001, the City, the City of Banning, the BCVWD, the Yucaipa Valley Water District, and the South Mesa Water Company formed a joint powers agency, namely, the San Timoteo Watershed Management Authority (the STWMA), in order to formulate and implement a water resources management program for the San Timoteo Watershed, a large drainage area that includes the Beaumont Basin. In 2003, the STWMA filed a lawsuit in the Riverside County Superior Court, seeking to adjudicate the rights of several private parties and public agencies to Beaumont Basin groundwater.[5] The public agency defendants consisted of the City, the City of Banning, the BCVWD, the Yucaipa Valley Water District, and the South Mesa Water Company. The private party defendants included Sunny-Cal and its owners, Manheim, Manheim and Berman (Manheim), and nine other parties who claimed rights to Beaumont Basin groundwater.

In February 2004, the parties to the suit entered into a stipulated judgment (the 2004 Adjudication or Judgment). The private party defendants were identified as "overlying parties" and the public agency defendants as "appropriator parties." The overlying parties were defined as owners of land overlying the Beaumont Basin who had previously exercised "overlying water rights" to pump water from the basin, and their successors and assigns.

Sunny-Cal and Manheim were treated as one overlying party and were awarded 1,784 afa in "overlying water rights" to Beaumont Basin groundwater. Their 1,784 afa entitlement was based in part on a "five-year rolling average" of the amount of water Sunny-Cal had drawn from the basin each year between 1997 and 2001, or 1,340 afa. All overlying parties, including Sunny-Cal and Manheim, were awarded a total of 8,650 afa in overlying water rights.

Concomitantly, the Judgment stipulated that the "safe yield" of the Beaumont Basin was 8,650 afa for each of the 10 years following the February 2004 entry of the Judgment, and defined "safe yield" as "the maximum quantity of water which can be produced annually from a [g]roundwater [b]asin under a given set of conditions without causing a gradual lowering of the groundwater level leading eventually to depletion of the supply in storage." The Judgment expressly acknowledged that the Beaumont Basin was "at or near a condition of [o]verdraft," and defined "overdraft" as "a condition wherein the total annual production from a [g]roundwater [b]asin exceeds the [s]afe [y]ield thereof."

---

[5] The suit was entitled *San Timoteo Watershed Management Authority v. City of Banning* (Super. Ct. Riverside County, 2004) and was assigned case No. RIC389197.

The Judgment provided that to the extent any overlying party obtained water service from an appropriator party, the overlying party would forebear use of that volume of water, and an equivalent amount of water would be "earmarked" for use by the overlying party. The Judgment acknowledged that this provision was intended to ensure that the overlying party would receive credit towards satisfying "the water availability assessment provisions" of Government Code section 66473.7 and Water Code section 10910 et seq., "or other similar provisions of law, equal to the amount of groundwater earmarked . . . ."

The Judgment also adopted and ordered the parties to comply with a "[p]hysical [s]olution" "[i]n accordance with the mandate of Section 2 of Article X of the California Constitution." (See *California American Water v. City of Seaside* (2010) 183 Cal.App.4th 471, 480 [107 Cal.Rptr.3d 529] ["'[a] physical solution is an equitable remedy designed to alleviate overdrafts and the consequential depletion of water resources in a particular area, consistent with the constitutional mandate to prevent waste and unreasonable water use . . . .'"].) The physical solution enjoined the parties from producing groundwater from the Beaumont Basin except as provided in the Judgment and addressed "all [p]roduction and [s]torage within the Beaumont Basin." The physical solution was intended "to establish a legal and practical means for making the maximum reasonable beneficial use of the waters of Beaumont Basin, to facilitate conjunctive utilization of surface, ground and Supplemental Waters [(defined as waters imported from outside the Beaumont Basin)], and to satisfy the requirements of water users having rights in, or who are dependent upon, the Beaumont Basin." The Judgment empowered a "[w]atermaster," consisting of a committee of persons nominated by the appropriator parties, to enforce the physical solution and develop "a groundwater management plan and program for the Beaumont Basin."

In accordance with the Judgment and as part of the project approvals, Sunny-Cal and Manheim agreed to assign their 1,784 afa in overlying water rights to the BCVWD. In exchange, the BCVWD agreed to "earmark" 1,784 afa of Beaumont Basin groundwater specifically and exclusively for the SCSP. After the SCSP was downsized in early 2006 to exclude the 120-acre portion of the Danny Thomas Ranch north of Cherry Valley Boulevard, Sunny-Cal and the BCVWD agreed to allocate 300 afa of Sunny-Cal/Manheim's 1,784 afa entitlement to "Sunny-Cal North" or to the 120-acre portion of the Danny Thomas Ranch. The other 1,484 afa was allocated to the 200-acre SCSP area south of Cherry Valley Boulevard.

### 3. *The 2005 Water Supply Assessment (the WSA)*

■ As indicated in the Judgment and as explained in *Vineyard Area Citizens, supra,* 40 Cal.4th at page 433: "Government Code section 66473.7

generally requires a city or county, before approving a subdivision map for a residential development of more than 500 units, to obtain from the applicable public water system a 'written verification' that adequate water supplies will be available for that project as well as other existing and planned future uses for a projected 20-year period. . . .

"Water Code sections 10910 to 10912 . . . apply more broadly to any large land use project (not only residential developments) and to approval of any such project subject to CEQA (not only to subdivision map approvals). (Wat. Code, §§ 10910, subd. (a), 10912, subds. (a), (b).) They require the city or county considering a project to obtain, at the outset of the CEQA process, a water supply 'assessment' from the applicable public water system. (Wat. Code, § 10910, subd. (b).) The 'water supply assessment' is then to be included in any CEQA document the city or county prepares for the project. (Wat. Code, § 10911, subd. (b).)" (Fn. omitted.) CEQA, in turn, requires compliance with these Water Code provisions. (§ 21151.9.)

In March 2005, the BCVWD prepared the WSA for the original 323.3-acre, 907-residential unit SCSP. The WSA estimated that the original SCSP would require up to 706 afa of water, including 588 afa of potable water suitable for drinking, and 118 afa of irrigation or recycled water, and concluded that sufficient supplies of water were available to meet the demands of the SCSP for 20 years. This conclusion was based on Sunny-Cal/Manheim's agreement to assign their entire 1,784 afa entitlement of overlying water rights in the Beaumont Basin to the BCVWD, and the BCVWD's agreement to earmark and supply up to an equal amount of Beaumont Basin groundwater to the SCSP. In short, the WSA concluded that Sunny-Cal/Manheim's 1,784 afa entitlement was more than sufficient to meet the needs of the original, larger scale SCSP over 20 years.

Under a heading titled "Additional Supplies," the WSA further concluded that the BCVWD would have sufficient supplies of water to meet the needs of the original SCSP *from sources other than* Sunny-Cal/Manheim's 1,784 afa entitlement over 20 years, or through the year 2025. More specifically, the WSA concluded the BCVWD would have sufficient supplies of water from its two existing sources, namely, the Beaumont Basin and a second ground-water basin, Edgar Canyon, together with additional supplies generated as a result of its plans to develop a wastewater recycling/irrigation program, a storm water recapture/groundwater recharge program, and imports of water from the State Water Project (SWP water).

In the WSA, the BCVWD discussed the sources of its anticipated water supplies in some detail. Based on studies conducted by itself, the STWMA,

and the San Gorgonio Pass Water Agency (the SGPWA), the BCVWD estimated that the "long-term safe yield" of the Beaumont Basin was 10,000 afa, or 1,350 afa more than the 8,650 afa estimated and agreed upon in the Judgment, and that the safe yield of the Edgar Canyon was around 1,800 afa. The WSA cautioned that the 8,650 afa estimate of the Beaumont Basin's long-term safe yield was "conservative," and noted that the studies supporting the BCVWD's higher estimated safe yield of 10,000 afa did not consider the "deep aquifer yields" indicating the Beaumont Basin had abundant groundwater supplies at 1,500 feet below ground surface.

The WSA explained that recycled water would be used for irrigation purposes and was expected to "free-up" potable groundwater the BCVWD was currently taking from its groundwater sources and using for irrigation. Recaptured storm water would be used to recharge the Beaumont Basin, freeing additional Beaumont Basin groundwater over the long term. The BCVWD was in the process of developing and implementing its wastewater recycling and storm water recapture/groundwater recharge programs, and their completion depended in part on fees the BCVWD expected to receive from residential and other development in its service area.

Regarding SWP water, the WSA explained that the BCVWD expected to import 6,540 afa of "Table A" SWP water through the SGPWA and use that water to recharge the Beaumont Basin. Additional imports of SWP water would supply as much as 20 percent of the BCVWD's overall water needs. The State Water Project stores and delivers supplemental water to state water contractors, including the SGPWA, through a system of reservoirs, pumping plants, and the Governor Edmund G. Brown California Aqueduct. The SGPWA was created in 1961 for the purpose of preserving water resources in its jurisdiction, the San Gorgonio Pass area, and is responsible for operating and maintaining the State Water Project in the San Gorgonio Pass area. The San Gorgonio Pass area covers a 220-square-mile area including the City, Cherry Valley, Cabazon, and the Morongo Indian Reservation. The SGPWA has an entitlement of 17,300 afa of "Table A" SWP water, but in allocating that water is required to give the "highest priority" to eliminating overdraft conditions in the San Gorgonio Pass area. (72A West's Ann. Wat.—Appen. (1999) § 101-15.5, p. 429.)

In the WSA, the BCVWD explained that the SGPWA had indicated the BCVWD would be allotted 6,540 afa of the SGPWA's 17,300 afa "Table A" entitlement, though the BCVWD acknowledged that this 6,540 afa allotment could "only be considered preliminary" because it was based on an "assessed valuation conducted in 1988." Any additional SWP water purchased from the SGPWA or through other state water contractors would be used to directly serve the BCVWD's customers. Finally, the WSA noted that 4,000 afa of SWP water was currently for sale by another state water contractor.

The WSA also incorporated by reference the BCVWD's most recent update to its urban water management plan, prepared in August 2002 (the August 2002 UWMP Update). Like all urban water suppliers, the BCVWD is required to prepare an urban water management plan and update that plan every five years. (Wat. Code, §§ 10610, 10656.) According to its August 2002 UWMP Update, the BCVWD expected to reduce its dependence on Beaumont Basin groundwater, which it relied on for "most of [its] water supply," and limit its reliance on imported SWP water to 20 percent of its overall water demand. This 20 percent would be supplied not from the SGPWA's 17,300 afa Table A allotment, but from other purchases of SWP water.

### 4. The 2005 Urban Water Management Plan (the 2005 UWMP)

In January 2006, after the WSA was prepared in March 2005, the BCVWD again updated its urban water management plan (the 2005 UWMP Update). The 2005 UWMP Update concluded that the BCVWD would have sufficient supplies of water to serve the needs of *all* its customers, including the needs of the original SCSP, through 2030. Plaintiffs claim the 2005 UWMP Update and the WSA contained significant "factual and analytical deficiencies" and inconsistencies that precluded the City from engaging in the type of water impacts analysis CEQA requires. These claimed deficiencies and inconsistencies are discussed below.

### 5. The 2007 Report on Water Conditions by the SGPWA

In April 2007, one year after the revised EIR was circulated but before the public comment period expired, the SGPWA issued a Report on Water Conditions in the San Gorgonio Pass area for the 2004 to 2005 period. According to the report, engineering studies performed in 1995 and 2002 showed the long-term safe yield of the Beaumont Basin was between 5,000 and 6,100 afa, smaller than the 8,650 afa estimated in the Judgment or the 10,000 afa estimated by the BCVWD in the WSA.[6] In 2004 and 2005, respectively, 17,756 and 13,670 acre-feet of water were drawn from the Beaumont Basin, or approximately 11,656 and 7,579 acre-feet in excess of the SGPWA's 6,100 afa estimate of its safe yield. The report thus concluded that the Beaumont Basin was in an "apparent" state of overdraft, and described the overdraft as "apparent" because it assumed conditions in the Beaumont Basin were substantially unchanged from the time the engineering studies were completed in 1995 and 2002.

---

[6] The SGPWA had been monitoring overdraft in the Beaumont Basin since at least 1988, when the agency's first engineering investigation indicated that aggregate pumping from the basin had significantly exceeded its safe yield.

The report stated: "[I]n order to eventually achieve a state of equilibrium in the Beaumont Basin, it may be necessary in certain years to recharge more than 8,000 acre-feet of supplemental water in the Basin. As of the end of 2005, there were not enough recharge facilities in the Beaumont Basin to take that much water." The report explained that, as of the end of 2005, the Little San Gorgonio Creek recharge facility, with a capacity of approximately 1,800 to 2,000 acre-feet per year, was the only recharge facility operating in the Beaumont Basin. The report also noted, however, that in September 2006, after the period covered by the report, the BCVWD had "placed a large recharge facility on-line on its property near Beaumont Avenue and Cherry Valley Boulevard. As of that date, the recharge capacity of the Beaumont Basin has increased, and it will in the future be easier to mitigate overdraft in the Basin." Since March 2005, the SGPWA had been using all its imports of SWP water to directly recharge the Beaumont Basin through the agency's Little San Gorgonio Creek Recharge Facility. But in September 2006, the BCVWD began purchasing SWP water from the SGPWA and was using all of it to recharge the Beaumont Basin at the BCVWD's new recharge facility in Cherry Valley. Even with the BCVWD's additional recharging capacity, however, the report concluded that the Beaumont Basin had a shortage of recharging capacity.

Finally, the report noted that in 2003 the SGPWA achieved a "major milestone" toward eliminating overdraft conditions in the Beaumont Basin and other parts of the San Gorgonio Pass area with the completed construction of phase I of the east branch extension pipeline and pumping station (EBX Phase I) of the State Water Project. The EBX Phase I extended the Governor Edmund G. Brown California Aqueduct to the Cherry Valley area and the Beaumont Basin. The capacity of the EBX Phase I was limited to 8,650 afa, perhaps not coincidentally the agreed-upon maximum safe yield of the Beaumont Basin by the parties to the 2004 Adjudication and Judgment. When the report was issued in April 2007, a project to construct additional transmission facilities capable of carrying the SGPWA's full SWP water allotment of 17,300 afa was in the planning stages and was expected to be fully operational by 2012.

### 6. *The Final EIR's Conclusions*

In the final EIR, the City concluded the SCSP would not significantly impact water supplies and resources principally because Sunny-Cal and Manheim were assigning their right to draw 1,484 afa of groundwater from the Beaumont Basin to the BCVWD, and the same amount of Beaumont Basin groundwater would be "earmarked" or set aside specifically for the SCSP. This amount far exceeded the 531 afa of water the SCSP, in its final form with 560 residential units on 200 acres, would consume in a "worst case" scenario.

## B. *The Baseline Question*

Plaintiffs first contend the EIR failed to properly analyze the SCSP's impacts on area water supplies and resources because it relied on an improper baseline or environmental setting in analyzing these impacts—specifically, Sunny-Cal's adjudicated right to draw 1,484 afa of groundwater from the Beaumont Basin. They argue the EIR should have analyzed these impacts based on the much lower 50 afa that Sunny-Cal was actually using on the project site after it ceased operating the egg farm in late 2005, and the use of the 1,484 afa figure caused the EIR to oversimplify and understate the project's true impacts on area water supplies and resources.

In order to determine whether a project is likely to have significant environmental effects, the lead agency "must use some measure of the environment's state absent the project, a measure sometimes referred to as the 'baseline' for environmental analysis." (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 315 [106 Cal.Rptr.3d 502, 226 P.3d 985] (*CBE*).) Section 15125, subdivision (a) of the Guidelines sets forth the *general* rule agencies are required to follow in determining the proper baseline. It states: "An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. This environmental setting will *normally* constitute the baseline physical conditions by which a lead agency determines whether an impact is significant." (Italics added.)

In using the word "normally," section 15125, subdivision (a) of the Guidelines necessarily contemplates that physical conditions *at other points in time* may constitute the appropriate baseline or environmental setting. (*Fat v. County of Sacramento* (2002) 97 Cal.App.4th 1270, 1277–1278 [119 Cal.Rptr.2d 402].) Though the baseline conditions are generally described as the " 'existing physical conditions in the affected area,' " or the " ' "real conditions on the ground" ' " (*CBE, supra*, 48 Cal.4th at p. 321), " 'the date for establishing baseline cannot be a rigid one. Environmental conditions may vary from year to year and in some cases it is necessary to consider conditions over a range of time periods' " (*id.* at pp. 327–328, quoting *Save Our Peninsula, supra*, 87 Cal.App.4th at p. 125). Environmental conditions may also change during the period of environmental review, and temporary lulls or spikes in operations that happen to occur during the period of review should not depress or elevate the baseline. (*CBE, supra*, at p. 328.) Accordingly, "[n]either CEQA nor the CEQA Guidelines mandates a uniform, inflexible rule for determination of the existing conditions baseline. Rather, an agency enjoys the discretion to decide, in the first instance, exactly how

the existing physical conditions without the project can most realistically be measured, subject to review, as with all CEQA factual determinations, for support by substantial evidence. [Citation.]" (*Ibid.*)

An agency's determination of the proper baseline for a project can be difficult and controversial, particularly when the physical conditions in the vicinity of the project are subject to fluctuations (*Fairview Neighbors v. County of Ventura* (1999) 70 Cal.App.4th 238, 242–243 [82 Cal.Rptr.2d 436]); are difficult to discern because little historical data concerning them are available (*Save Our Peninsula, supra*, 87 Cal.App.4th at pp. 110–111, 125–126); or when appropriate studies concerning them have not been conducted (*County of Amador v. El Dorado County Water Agency, supra*, 76 Cal.App.4th at p. 952; *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 659 [57 Cal.Rptr.3d 663]). Without an appropriate baseline description, an adequate analysis of a project's impacts, mitigation measures, and alternatives "becomes impossible." (*County of Amador v. El Dorado County Water Agency, supra*, at p. 953.)

In certifying the final EIR, the City concluded that the 1,484 afa Sunny-Cal was entitled to pump from the Beaumont Basin pursuant to the Judgment and was transferring to the BCVWD as part of the project approvals was the appropriate baseline to use in measuring the SCSP's impacts on area water resources. Given this baseline, the City concluded the SCSP would not significantly impact area water resources because, even in a "worst case" scenario, the SCSP would consume no more than 531 afa of water, much less than the 1,484 afa entitlement. To be sure, in responses to comments in the final EIR, the City pointed out that the SCSP would add over 900 afa of Beaumont Basin groundwater to the BCVWD's existing supplies, and this amount would be available to serve the BCVWD's other customers.

■ The City's selection of the 1,484 afa figure as the baseline for determining the SCSP's impacts on area water supplies and resources was quintessentially a discretionary determination of how the "existing physical conditions without the project" could "most realistically be measured." (*CBE, supra*, 48 Cal.4th at p. 328.) The City's determination is reviewed for substantial evidence (*ibid.*), and substantial evidence shows that the 1,484 afa figure was a realistic and proper baseline to use in measuring the SCSP's impacts on area water resources. Most significantly, the Judgment afforded Sunny-Cal the right to use 1,784 afa of Beaumont Basin groundwater each year beginning in February 2004, and Sunny-Cal retained 1,484 afa of this entitlement for use on the 200-acre SCSP site after assigning 300 afa of its entitlement to "Sunny-Cal North" in 2006. In addition, the 1,484 afa figure was not substantially higher than Sunny-Cal's average annual use of 1,340 afa, between 1997 and 2001, in operating the egg farm on the project site.

Though, as plaintiffs point out, Sunny-Cal was using only 50 afa on the site after it ceased operating the egg farm in late 2005, its right to use its full 1,484 afa entitlement on the project site was wholly unaffected by its cessation of the egg farm operations. The 1,484 afa figure thus accurately reflected "the physical environmental conditions in the vicinity of the project, as they exist[ed] at the time the notice of preparation [was] published" in December 2004 (Guidelines, § 15125, subd. (a)) or the " ' "real conditions on the ground" ' " at that time (*CBE, supra*, 48 Cal.4th at p. 321, quoting *Save Our Peninsula, supra*, 87 Cal.App.4th at p. 121). Nor had these conditions changed by the time the revised EIR was circulated in early 2006 or by the time the final EIR was certified in August 2007. As discussed, Sunny-Cal's right to use 1,484 afa on the project site was unaffected by its cessation of the egg farm operations in late 2005, and the 1,484 afa figure closely approximated Sunny-Cal's historic water usage on the project site while the egg farm was operating.

Nor do plaintiffs explain how the use of Sunny-Cal's 1,484 afa entitlement as the baseline resulted in an "oversimplification and unjustified dismissal of significant impacts [on] water resources." Had the City used the 50 afa figure as the baseline, the EIR would have necessarily concluded that the SCSP, with its anticipated water demands of as much as 531 afa, would significantly impact area water supplies by adding as much as 481 afa to existing demands on the BCVWD's supplies. But this would have been misleading, given Sunny-Cal's right to pump 1,484 afa of groundwater from the Beaumont Basin and its agreement to transfer its entire 1,484 afa entitlement to the BCVWD as part of the project approvals. Rather than consume additional Beaumont Basin groundwater, as plaintiffs claim, substantial evidence showed the SCSP would, as the final EIR concluded, make *more* Beaumont Basin groundwater available for the BCVWD's other customers—more than 900 additional afa.

Plaintiffs argue that the decisions in *CBE, Woodward Park*, and *Environmental Planning & Information Council v. County of El Dorado* (1982) 131 Cal.App.3d 350 [182 Cal.Rptr. 317] (*EPIC*) support their claim that the City abused its discretion in failing to use the 50 afa figure as the baseline for assessing the SCSP's impacts on area water resources. We disagree. Each of these cases involved the erroneous use of hypothetical or allowable conditions as baselines—that is, conditions that were permissible pursuant to an existing plan or regulation but that were not being employed or that did not exist "on the ground" at the time environmental review commenced. Sunny-Cal's 1,484 afa entitlement to Beaumont Basin groundwater was not a hypothetical or allowable condition, but a condition that existed on the ground and that had existed on the project site since February 2004, well before the notice of preparation was published in December 2004

and environmental review of the original SCSP commenced. The facts of *CBE, Woodward Park,* and *EPIC* illustrate this critical distinction.

*CBE* involved a project to expand the operating capacity of a petroleum refinery's boilers, which produced steam for the refinery's operations and nitrogen oxide, a major contributor to smog. (*CBE, supra,* 48 Cal.4th at p. 317.) As its baseline for determining the project's environmental impacts, the agency relied on the amount of heat the refinery's boilers were allowed to emit under the refinery's existing permits, though each boiler had operated at its maximum permitted capacity in only limited circumstances—when one or more other boilers were shut down for maintenance. (*Id.* at pp. 320–322.) The agency issued a negative declaration, concluding the expansion project would not significantly impact the environment because the project would result in the boilers emitting less heat, steam, and nitrogen oxide than they were allowed to emit under the existing permits. (*Id.* at pp. 316–317.) The court concluded the agency abused its discretion in using the maximum permitted capacity of the boilers as the baseline for its impacts analysis, because the maximum permitted capacity was a "hypothetical allowable condition[]" which resulted in an "illusory" comparison of the project's impacts with a hypothetical baseline, and misled the public concerning the project's true environmental impacts. (*Id.* at pp. 317, 322.)

Like *CBE, Woodward Park* before it involved the erroneous use of a "hypothetical allowable condition" as a baseline, namely, a 694,000-square-foot office park and retail development that had never been built but that constituted the maximum-size development allowable on the project site under existing plan and zoning designations. (*Woodward Park, supra,* 150 Cal.App.4th at pp. 692–693, 697.) The proposed project was to build a smaller, 477,000-square-foot office park and shopping center *on a vacant lot,* but the EIR for the most part compared the proposed project's impacts on traffic congestion and air pollution with the larger, hypothetical development rather than with the vacant lot or the "existing physical situation." (*Id.* at pp. 692, 697–698, 707–708.) This caused the EIR to understate the proposed project's true impacts on traffic congestion and air pollution. (*Id.* at pp. 708–709.) The court observed that the public will "naturally assume" an EIR will "compare what will happen if the project is built with what will happen if the site is left alone," rather than compare the project's impacts with a hypothetical project or condition. (*Id.* at p. 707.) Accordingly, the use of the larger hypothetical development as the baseline was misleading.

*EPIC* was the first in a long line of cases that, like the more recent decisions in *Woodward Park* and *CBE,* concluded that the use of hypothetical allowable conditions as baselines is erroneous because it distorts a project's true environmental impacts and may also lead to the failure to consider

feasible alternatives and mitigation measures. (See *CBE, supra,* 48 Cal.4th at p. 321, fn. 6, and cases cited.) In *EPIC,* the court concluded that two EIR's for two general plan amendments were legally inadequate because they compared the impacts of the amendments with the county's existing general plan, which had not been fully implemented, rather than with the actual conditions in the areas to be affected by the amendments. (*EPIC, supra,* 131 Cal.App.3d at pp. 357–358.) The general plan called for maximum populations of 70,400 and 63,600 in two areas, and the amendments would have reduced these figures to 5,800 and 22,400. The existing populations were only 418 and 3,800. The EIR concluded the amendments would have no adverse environmental impacts because they would significantly reduce the populations in the affected areas. The court called this comparison "illusory" and reasoned it could "only mislead the public as to the reality of the impacts and subvert full consideration of the actual environmental impacts which would result," given that the amendments would significantly increase the population in each area. (*Id.* at p. 358; see also *City of Carmel-by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229, 246–247 [227 Cal.Rptr. 899] [effects of rezoning must be compared to existing physical environment, rather than to development allowed under a prior land use plan].)

Plaintiffs maintain that Sunny-Cal's entitlement to 1,484 afa of Beaumont Basin groundwater is indistinguishable from the hypothetical allowable conditions or invalid baselines involved in *CBE, Woodland Park,* and *EPIC.* Again, they point out that Sunny-Cal was not pumping 1,484 afa but only 50 afa after it closed the egg farm in late 2005, and Sunny-Cal had no plans to resume the egg farm operations. The comparison fails because Sunny-Cal not only had a history of pumping substantially the same amount of Beaumont Basin groundwater in its egg farm operations (an average of 1,340 afa between 1997 and 2001), but was entitled to pump up to 1,484 afa on the 200-acre project site. The 1,484 afa entitlement was not a hypothetical amount of water that Sunny-Cal had never used or had no right to use on the project site. (Compare *San Joaquin Raptor Rescue Center v. County of Merced, supra,* 149 Cal.App.4th at p. 658 ["established levels of a particular use have been considered to be part of an existing environmental setting"] with *Save Our Peninsula, supra,* 87 Cal.App.4th at p. 121 [entitlement to use additional water on project site was "not the same as actual use"].)

C. *The EIR Adequately Analyzed the SCSP's Impacts on the Beaumont Basin and the BCVWD's Total Water Supplies*

■ Plaintiffs further claim the EIR failed to adequately analyze the SCSP's impacts on local and regional water supplies because it failed to coherently and consistently explain how the BCVWD would have sufficient supplies of water to serve the needs of *both the SCSP and the BCVWD's*

*other customers* over an approximate 20-year period. They argue the EIR relied on "faulty assumptions and unduly optimistic predictions" concerning the long-term availability of water supplies in the BCVWD's service area, specifically those set forth in the BCVWD's WSA for the original SCSP and its 2005 UWMP Update. In support of this claim, they rely on *Vineyard Area Citizens, supra,* 40 Cal.4th at pages 428 through 432, where the court articulated and established four essential standards that EIR's are required to meet in evaluating whether long-term water supplies for large-scale development projects are *likely* to be met.

First, the EIR is inadequate if it simply ignores or assumes a solution to the problem of supplying water to a proposed land use project. Instead, the EIR must present agency decision makers and the public with "sufficient facts to 'evaluate the pros and cons of supplying the amount of water that the [project] will need.' [Citation.]" (*Vineyard Area Citizens, supra,* 40 Cal.4th at p. 431, quoting *Santiago County Water Dist. v. County of Orange* (1981) 118 Cal.App.3d 818, 829 [173 Cal.Rptr. 602].) Second, the EIR must assume that all phases of the project will be built and, to the extent possible, must analyze the impacts of providing water to the *entire* project. In short, the water supply needs of later phases of a large-scale development project cannot be deferred to future analysis through the use of tiered EIR's. (*Vineyard Area Citizens, supra,* at p. 431; *Santa Clarita Organization for Planning the Environment v. County of Los Angeles* (2003) 106 Cal.App.4th 715 [131 Cal.Rptr.2d 186]; *Stanislaus Natural Heritage Project v. County of Stanislaus* (1996) 48 Cal.App.4th 182, 206 [55 Cal.Rptr.2d 625].)

"Third, the future water supplies identified and analyzed must bear a likelihood of actually proving available; speculative sources and unrealistic allocations ('paper water') are insufficient bases for decisionmaking under CEQA. [Citation.] An EIR for a land use project must address the impacts of *likely* future water sources, and the EIR's discussion must include a reasoned analysis of the circumstances affecting the likelihood of the water's availability." (*Vineyard Area Citizens, supra,* 40 Cal.4th at p. 432, citing *Santa Clarita Organization for Planning the Environment v. County of Los Angeles, supra,* 106 Cal.App.4th at pp. 720–723 and *California Oak Foundation v. City of Santa Clarita* (2005) 133 Cal.App.4th 1219, 1244 [35 Cal.Rptr.3d 434].) Fourth and finally, "where, despite a full discussion, it is impossible to confidently determine that anticipated future water sources will be available, CEQA requires some discussion of possible replacement sources or alternatives to use of the anticipated water, and of the environmental consequences of those contingencies. [Citation.]" (*Vineyard Area Citizens, supra,* at p. 432; see *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 373 [110 Cal.Rptr.2d 579].)

■ The court in *Vineyard Area Citizens* was careful to note, however, that none of the appellate court decisions it cited and relied upon in articulating the four requirements either held or suggested that an EIR for a land use plan is inadequate unless it demonstrates the project "is definitely assured water through signed, enforceable agreements with a provider and already built or approved treatment and delivery facilities." (*Vineyard Area Citizens, supra*, 40 Cal.4th at p. 432.) To the contrary, the court observed, CEQA does not require an EIR to show a project is *certain* to have sufficient future water supplies, because "[r]equiring certainty when a long-term, large-scale development project is initially approved would likely be unworkable, as it would require water planning to far outpace land use planning." (*Ibid.*) In addition, "long-term local water planning is not a burden that must be taken up anew, for CEQA purposes, each time a development is proposed; rather, cities and counties may rely on existing urban water management plans, so long as the expected new demand of the [project] was included in the water management plan's future demand accounting. [Citations.]" (*Id.* at pp. 446–447.)

Plaintiffs argue the EIR failed to comply with the third and fourth requirements of *Vineyard Area Citizens* because it did not "clearly and coherently identify the [p]roject's sources of water and disclose the impacts of providing the new water to [the] [p]roject." Nor, they argue, did the EIR explain how water supplies for the project were likely to be met over the long term, the impacts of providing those supplies, or how these impacts were to be mitigated. Though they acknowledge Sunny-Cal's 1,484 afa entitlement afforded the SCSP "its own water," plaintiffs point out that the water for the SCSP is to be supplied by the BCVWD, not from the four Beaumont Basin groundwater wells on the 200-acre project site, and the SCSP will have to be served "just like all of [the BCVWD's] other customers." The BCVWD, plaintiffs argue, must still come up with the 531 afa of water the 200-acre SCSP will consume, and neither the WSA, the 2005 UWMP Update, nor the EIR coherently explained how the BCVWD would supply 531 afa of water to the SCSP over 20 years.

More specifically, plaintiffs claim the WSA and 2005 UWMP Update contained significant "factual and analytical deficiencies" and inconsistencies that precluded the City from engaging in the type of analysis CEQA requires. In short, they claim the WSA and 2005 UWMP Update revealed significant uncertainties concerning how much water the BCVWD will need to serve all its customers through 2025 or 2030—where that water will come from, and how much of it will be available.[7]

---

[7] Plaintiffs also point out that when a water supply assessment "is found to be incomplete or to contain inaccurate information or faulty analysis, the lead agency should request the water supplier to modify, correct or supplement the WSA." (*California Water Impact Network v. Newhall County Water Dist.* (2008) 161 Cal.App.4th 1464, 1487, fn. 21 [75 Cal.Rptr.3d 393].)

Regarding the BCVWD's anticipated supplies of SWP water, plaintiffs point out that the WSA assumed the BCVWD would receive 4,043 afa of SWP water in 2010, increasing to 4,611 in 2015, while the 2005 UWMP Update contained significantly different assumptions. It assumed the BCVWD would receive 6,464 afa of SWP water in 2010, increasing to 6,814 afa in 2015 and remaining at roughly that amount, or 6,872 afa, in 2030. In addition to the higher figures estimated in the 2005 UWMP Update, plaintiffs point out that this SWP water is not part of the SGPWA's Table A allotment that the BCVWD acknowledged had already been "spoken for," but is, rather, other SWP water the BCVWD expected to purchase from various state water contractors, including the SGPWA. The availability of this water is anything but certain, they argue.

Plaintiffs also question how any SWP water, in addition to the SGPWA's Table A allotment, can be delivered to the BCVWD, given that the SGPWA's EBX Phase I transmission lines can deliver only 8,650 afa of Table A SWP water to the San Gorgonio Pass area, and the proposal to double this capacity to the SGPWA's full entitlement of 17,300 afa of Table A SWP water is "only in the planning stages." The problem, plaintiffs argue, is "there is no indication of what the actual sources of this [non-Table A SWP] water are, or what the uncertainties associated with those sources are." And, given the City's "unquestioning reliance" on the BCVWD's "incomplete and contradictory documents," plaintiffs maintain the EIR has "failed as an informational document." The City, plaintiffs claim, "simply assume[d]" a solution to the water supply problem by relying on " '[s]peculative sources and unrealistic allocations ("paper water"),' " and thus violated the third requirement of *Vineyard Area Citizens*. (See *Vineyard Area Citizens, supra*, 40 Cal.4th at p. 432.)

Plaintiffs also claim the WSA and 2005 UWMP Update contained speculative and inconsistent projections concerning available supplies of recycled water. Recycled water is treated water from the City's sewer plant that would be used for nonpotable purposes. The WSA, they point out, claimed that recycled water available to the BCVWD would increase from 3,784 afa in 2005 to 5,198 afa in 2010, and to 10,465 by 2025. By contrast, the 2005 UWMP Update markedly reduced these estimates to zero afa of recycled water being available in 2005, 3,150 afa being available in 2010, and 5,128 afa being available in 2025, and the EIR never addressed these significant discrepancies. Moreover, plaintiffs point out that as of 2005 there was no distribution system in place to generate or deliver "all of this 'recycled water.' " In the 2005 UWMP Update, the BCVWD reported that the City was "in the final stages of expanding the treatment facility" and was "starting the design for the recycled water pumping station." Thus, plaintiffs argue, there was no "factual support" in the EIR "for the assumption that recycled water in the amounts predicted by the BCVWD would ever materialize."

Plaintiffs claim the EIR's discussion of the BCVWD's available groundwater sources was "equally deficient" because the EIR never explained how the BCVWD would obtain "ever increasing amounts of water" from the already overdrafted Beaumont Basin in order to supply 531 afa to the SCSP while also supplying the needs of the BCVWD's other customers. The BCVWD's solution to future water shortages, they argue, is to pump more water from the overdrafted Beaumont Basin, but the EIR did not discuss whether the BCVWD had the right to take as much Beaumont Basin groundwater as it wanted, and if it did, what the environmental impacts of doing so would be.

Nor, plaintiffs argue, did the City ever resolve a significant discrepancy between the WSA and the 2005 UWMP Update concerning how much water the BCVWD will extract from the already overdrafted Beaumont Basin. The 2005 UWMP Update called for extracting 9,461 afa from the Beaumont Basin in 2005, increasing to 22,982 afa in 2010, but decreasing to 18,196 afa in 2015 and remaining at approximately that level through 2030. By contrast, the WSA indicated the BCVWD would use 8,000 afa in total overlying groundwater rights to the Beaumont Basin in 2005 and 2010, and decreasing to only 200 afa through 2020. Again, plaintiffs argue, the EIR made no attempt to reconcile these inconsistencies, discuss the BCVWD's right, if any, to remove ever increasing amounts of groundwater from the Beaumont Basin, or discuss the environmental impacts of extracting so much groundwater from the Beaumont Basin.

Though these discrepancies and unanswered questions concerning the BCVWD's anticipated supplies of SWP water, recycled water, and groundwater were pointed out to the City during the administrative process, plaintiffs claim the City "stubbornly refused to address them," instead maintaining that the SCSP site "ha[d] its own allocation of groundwater" pursuant to the 2004 Adjudication, and questions concerning the BCVWD's operations and groundwater extraction beyond the 531 afa needs of the SCSP were not related to the project. The City's position, plaintiffs argue, reflects a misunderstanding of the City's obligations under *Vineyard Area Citizens*. We disagree. To the contrary, the City's position reflected an accurate reading of its obligations under *Vineyard Area Citizens*.

■ In sum, plaintiffs claim the EIR was legally inadequate because *it* failed to show the BCVWD would have sufficient supplies of water to meet the needs of *both* the SCSP *and* the BCVWD's other customers over 20 years. But the EIR was not required to make this showing. Instead, it was only required to show a *reasonable likelihood* that sufficient supplies of water, *from an identified source*, would be available to meet the needs of *this project, the SCSP*, over 20 years. (*Vineyard Area Citizens, supra*, 40 Cal.4th at pp. 432–433.) As the *Vineyard Area Citizens* court cautioned: "CEQA does

not necessarily require that an EIR show that total water supply and demand are or will be in balance in an area. *The EIR may by other means demonstrate a reasonable likelihood that water will be available for the project from an identified source . . . ."* (*Id.* at p. 446, italics added.)

The EIR made this showing. As the EIR repeatedly pointed out, the 200-acre SCSP site *has its own water entitlement.* And in exchange for the transfer of Sunny-Cal's entire 1,484 afa entitlement to the BCVWD, the BCVWD will be obliged to "earmark" up to the same amount of Beaumont Basin ground-water solely and exclusively for the SCSP, even though the SCSP will use, at most, only 531 afa of potable and recycled water from the BCVWD's supplies. It was for precisely this reason that the WSA concluded that the original, larger scale SCSP would have sufficient supplies of water to meet its greater needs of 706 afa over 20 years. The same reasoning applies to the smaller scale SCSP and its 531 afa requirement. Substantial evidence also showed the BCVWD would have the pumping and delivery capacity to provide as much as 531 afa of potable Beaumont Basin groundwater to the SCSP. Thus, the EIR demonstrated a reasonable likelihood that sufficient supplies of water would be available for *this project,* the 200-acre, 560-residential unit SCSP, *from an identified source,* the SCSP's own 1,484 afa entitlement, over 20 years. (*Vineyard Area Citizens, supra,* 40 Cal.4th at p. 432; see also *O.W.L. Foundation v. City of Rohnert Park* (2008) 168 Cal.App.4th 568, 589 [86 Cal.Rptr.3d 1] [when water supply for proposed project includes groundwater, Wat. Code, § 10910, subd. (f)(5) does not require basin-wide study of past and future pumping by all users of water from groundwater basin].)

It is therefore unnecessary for this court to determine whether the WSA, the 2005 UWMP, the EIR, or the record as a whole contains substantial evidence that the 531 afa requirements of the SCSP will be met over the long term *from sources other than Sunny-Cal's 1,484 afa entitlement, or the BCVWD's total supplies.* Even if, as plaintiffs argue, the WSA and 2005 UWMP Update are inconsistent and incomplete concerning the amounts and sources of water that will be available to the BCVWD over time, and are therefore insufficient to support the conclusion that the SCSP will have sufficient water available to it from sources other than the 1,484 afa entitle-ment, CEQA did not require the EIR to make this showing. Simply put, CEQA did not require the EIR to show that total water supply and demand are or will be in balance in the BCVWD's service area, because the EIR demonstrated a reasonable likelihood that the 531 afa needs of the SCSP would effectively be supplied from Sunny-Cal's 1,484 afa entitlement. (*Vineyard Area Citizens, supra,* 40 Cal.4th at p. 432.)

Plaintiffs also claim the EIR failed to address the *impacts* on the Beaumont Basin of providing water to the SCSP. The ultimate question under CEQA,

they argue, "is not whether an EIR establishes a likely source of water, but whether it adequately addresses the reasonably foreseeable *impacts* of supplying water to the project." (*Vineyard Area Citizens, supra*, 40 Cal.4th at p. 434.) We agree that the *impacts* on the Beaumont Basin of providing water to the SCSP were required to be addressed in the EIR, but conclude the EIR met this requirement.

Again, plaintiffs argue the EIR failed to properly address the SCSP's impacts on the Beaumont Basin because it incorrectly measured the SCSP's water consumption of 531 afa against the egg ranch's historical (1,340 afa) and adjudicated (1,484 afa) water rights, rather than against the 50 afa used on the SCSP site after Sunny-Cal ceased operating the egg farm in late 2005. By this measure, they argue, the SCSP will increase *existing extractions* from the Beaumont Basin by 481 afa. For the reasons discussed, however, the EIR realistically and appropriately relied on Sunny-Cal's 1,484 afa entitlement as the baseline for evaluating the SCSP's impacts on water supplies in the Beaumont Basin. Further, and for the reasons explained, the EIR properly concluded based on substantial evidence that the SCSP would not significantly impact *existing* water supplies in the Beaumont Basin. The SCSP would use significantly less Beaumont Basin groundwater (no more than 531 afa) than the egg farm had historically used (1,340 afa) or that Sunny-Cal and Manheim were entitled to use on the 200-acre SCSP site (1,484 afa) and were transferring to the BCVWD.

Plaintiffs' claims are concerned with the extent of the overdraft conditions in the Beaumont Basin and the impact the SCSP will have on these conditions. Plaintiffs correctly point out that the 2004 Adjudication and Judgment, through which Sunny-Cal and Manheim acquired their right to use 1,484 afa of Beaumont Basin groundwater on the 200-acre SCSP site, and in which the parties stipulated that the long-term safe yield of the Beaumont Basin was 8,650 afa, was not subjected to environmental review under CEQA. They also note that the EIR did not reconcile the 2004 Adjudication's 8,650 afa safe yield estimate with the lower 5,000 to 6,100 afa safe yield estimated by the SGPWA in its 2006 report on water conditions issued in early 2007.

CEQA, however, is concerned with the environmental impacts of the project under consideration. (§ 21100.) Thus, the ultimate question the EIR had to address was not the extent to which the Beaumont Basin was in overdraft, but whether and to what extent the SCSP—this project—would impact the Beaumont Basin's overdraft conditions *beyond existing conditions*. The EIR addressed this question by showing the SCSP would use as much as 531 afa of Beaumont Basin groundwater, far less than Sunny-Cal's existing entitlement to 1,484 afa of Beaumont Basin groundwater. The EIR properly

concluded, based on substantial evidence, that the SCSP would cause no *"additional withdrawals"* of Beaumont Basin groundwater beyond existing conditions.

Plaintiffs' reliance on *Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 95 [99 Cal.Rptr.2d 378] (Fourth Dist., Div. Two) is misplaced. That case involved a landfill project that had the potential to contaminate an underlying groundwater basin. This court concluded the EIR was legally inadequate because it did not quantify the amount of groundwater in the basin, and this quantification was essential to evaluating the extent of the contamination risk and whether the risk was worth taking. (*Id.* at pp. 92–95.) By contrast, substantial evidence shows the SCSP will not impact the overdraft conditions in the Beaumont Basin beyond the overdraft conditions that existed at the beginning of and throughout the period of environmental review of the SCSP.

## V. ANALYSIS/AGRICULTURAL LAND USE IMPACTS

Plaintiffs further claim the City, in preparing the EIR, failed to investigate and analyze feasible mitigation measures and alternatives for reducing the SCSP's impacts on agricultural land uses. More specifically, they argue there is no evidence to support the City's determination in the EIR that the SCSP's adverse impacts on agricultural land uses in the Cherry Valley area could not be feasibly mitigated because such land uses were no longer economically feasible. Nor, they argue, is there any evidence to support the City's determination that several onsite project alternatives to the SCSP, involving various degrees of continued agricultural uses on the site, were economically infeasible. We reject these claims.

### A. *Overview of Applicable CEQA Requirements*

"The core of an EIR is the mitigation and alternatives sections." (*Goleta Valley, supra,* 52 Cal.3d at p. 564.) The purpose of these sections is to consider how a project's significant environmental impacts, if any, may be eliminated or reduced through *feasible* mitigation measures and *feasible* project alternatives. (*Id.* at pp. 564–565; §§ 21002.1, subd. (a), 21061, 21100, subd. (b)(3), (4), 21150; Guidelines, §§ 15126.4, 15126.6.) "Feasible" means "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors." (Guidelines, § 15364.)

The nature and scope of the alternatives and mitigation measures that must be examined in an EIR is "guided by the doctrine of 'feasibility' " and a "rule of reason." (*Goleta Valley, supra*, 52 Cal.3d at p. 565.) " ' " 'CEQA does not require analysis of every *imaginable* alternative or mitigation measure.' " ' " (*Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 935 [45 Cal.Rptr.3d 102].) Nor does it "demand what is not realistically possible, given the limitation of time, energy and funds." (*Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 841 [29 Cal.Rptr.2d 492] (*Concerned Citizens*).) In evaluating the adequacy of an EIR's discussion of mitigation measures and alternatives, " ' "[t]he key issue" ' " is whether the discussion " ' "fosters informed decisionmaking and informed public participation." ' " (*Laurel Heights Improvement Assn. v. Regents of University of California, supra*, 47 Cal.3d at p. 404, italics omitted.) An EIR must only consider " 'a reasonable range of project alternatives and mitigation measures' . . . ." (*Concerned Citizens, supra*, at p. 843.)

 "Under CEQA, the public agency bears the burden of affirmatively demonstrating that, notwithstanding a project's impact on the environment, the agency's approval of the proposed project followed meaningful consideration of alternatives and mitigation measures." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 134 [65 Cal.Rptr.2d 580, 939 P.2d 1280].) The agency may not approve a project with significant environmental impacts "if there are *feasible alternatives* or *feasible mitigation measures* available which would substantially lessen" the project's significant environmental impacts, but "in the event specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures," the project may be approved despite its significant environmental impacts. (§ 21002, italics added; see *Goleta Valley, supra*, 52 Cal.3d at p. 565.)

B. *Mitigation Measures to Reduce Agricultural Impacts*

Plaintiffs claim the EIR failed to adequately discuss feasible mitigation measures that would have reduced the SCSP's impacts on agricultural resources. Specifically, they argue the EIR was inadequate as an information document because it failed to consider several offsite mitigation measures, including the purchase of offsite lands for long-term agricultural use, the placement of offsite lands into agricultural conservation easements under the

Agricultural Land Stewardship Program Act of 1995[8] or Williamson Act contracts,[9] and the use of impact fees to fund these and other offsite mitigation measures.[10]

### 1. *Relevant Background*

The EIR concluded the SCSP would have significant impacts on agricultural resources in the Cherry Valley and north Beaumont areas, which had "historically supported a variety of agricultural uses (e.g., cherry orchards, egg farms, turkey ranches, horse stables, etc.)." The EIR explained the SCSP would cover "prime agricultural soils" and would also contribute to cumulative impacts on agricultural resources in the area brought about by "tremendous" and "continuing" urban and suburban growth in the area. The EIR noted that "[a]pproximately 9,500 acres or 15 square miles" of the area "will be developed into various suburban uses, constituting over 15,000 homes and support uses."

The EIR explained that "[a]s the area continues to grow, more agriculture will be displaced by suburban and urban land uses. . . . *There is no feasible long-term mitigation other than placing large blocks of farmland into conservation easements, Williamson Act preserve status, or other temporary protection or preservation plans*." (Italics added.) Then, in the next paragraph, the

---

[8] The Agricultural Land Stewardship Program Act of 1995 (§ 10200 et seq.) established a program "to encourage and make possible the long-term conservation of agricultural lands" through the placement of such lands under permanent agricultural conservation easements. (§ 10201, subd. (e); see § 10211.) The act declared that "[a]gricultural lands near urban areas that are maintained in productive agricultural use are a significant part of California's agricultural heritage." (§ 10201, subd. (c).)

[9] Under the Williamson Act, also known as the California Land Conservation Act of 1965 (Gov. Code, § 51200 et seq.), property owners may have their lands assessed on the basis of agricultural production rather than current market values. The Beaumont 2006 General Plan Update explained that "[p]roperty owners entering into cont[r]acts pursuant to the Williamson Act are therefore relieved from higher property taxes as long as their land remains in agricultural production. The purpose of the Act is to encourage continuing agricultural production of *viable* farmlands, and prevent their premature conversion to urban uses. Participation under the Williamson Act requires 100 contiguous acres of agricultural lands under single or multiple ownerships. Entering into a Williamson Act contract restricts affected properties to agricultural and related supporting uses for a period of 10 years, with automatic yearly renewals for subsequent 10-year contractual periods, unless canceled by the property owner(s)." (Italics added.)

[10] In addition to funding the purchase of offsite lands, conservation easements, and Williamson Act contracts, plaintiffs claim that impact fees could have been used to fund donations to land trusts, public education programs, grants for new farmers, the replacement of revenue lost from tax credits, and resolving land use conflicts. None of these potential mitigation measures or the EIR's failure to address them was raised during the administrative process or in the trial court. We are therefore without jurisdiction to address them here. (§ 21177; *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 615–616 [91 Cal.Rptr.3d 571].)

EIR indicated that such long-term mitigation measures were infeasible. After noting the "long term continued production of eggs in this area" was no longer economically viable, the EIR reasoned that "[a]gricultural uses will continue to relocate out of this area as urban development moves east from Riverside and San Bernardino, and as land values and land use conflicts with urban development increase. This regional loss, both for the project site and the surrounding area, is considered a cumulatively considerable impact which cannot be feasibly mitigated." Thus, the EIR concluded there were no feasible mitigation measures to reduce the SCSP's direct or cumulative impacts on agricultural lands because the loss of farmland would still occur.

## 2. *Analysis*

Whether long-term agricultural uses were still feasible in the Cherry Valley and north Beaumont areas was a question of fact, and substantial evidence supports the City's determination in the EIR that such uses were no longer economically feasible. Concomitantly, substantial evidence shows that mitigation measures to reduce the SCSP's direct and cumulative impacts on long-term agricultural uses in the area were not economically feasible. Nor did plaintiffs advance any evidence that any of the offsite mitigation measures they claim the EIR should have analyzed would have been economically feasible.

Given these circumstances, the EIR properly treated any offsite land purchases, agricultural easements, Williamson Act contracts, and similar mitigation measures as *facially* infeasible and properly declined to analyze them in any detail. (*Concerned Citizens, supra*, 24 Cal.App.4th at pp. 840–842 [insufficient evidence supported claim that EIR was inadequate because it failed to discuss specific mitigation measure to reduce project's adverse impacts on availability of low-income housing]; cf. *Los Angeles Unified School Dist. v. City of Los Angeles* (1997) 58 Cal.App.4th 1019, 1029 [68 Cal.Rptr.2d 367] ["EIR must respond to specific suggestions for mitigating a significant environmental impact unless the suggested mitigation is facially infeasible."]; Guidelines, § 15126.4, subd. (a)(1) [EIR must discuss *feasible* mitigation measures].)

Furthermore, " '[a] court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated. [Courts] have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so.' [Citation.] The standard of review is not de novo but the traditional, deferential substantial evidence test . . . . [Citation.]" (*Concerned Citizens, supra*, 24 Cal.App.4th at pp. 842–843.)

As indicated in the EIR, substantial evidence showed that the Cherry Valley and north Beaumont areas were, in fact, experiencing "tremendous" and "continuing" urban and suburban development. Thousands of new homes had been built and were being built in the area. The EIR also pointed out that none of the land within a one-quarter mile area surrounding the SCSP site was considered "protected resource land," meaning none of it was under agricultural easements or Williamson Act contracts, and only 300 of the 980 acres in the area surrounding the SCSP site were under agricultural production.

Based on this evidence and the related increases in agricultural land values, which were creating pressures on owners of all types of agricultural lands to sell or convert their lands for urban and suburban development, the EIR reasonably concluded that any measures to reduce the SCSP's direct and cumulative adverse impacts on agricultural land uses in the Cherry Valley and north Beaumont areas would not have been economically feasible. As the EIR explained: "Agricultural uses will continue to relocate out of this area as urban development moves east from Riverside and San Bernardino, and as land values and land use conflicts with urban development increase."

*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261 [15 Cal.Rptr.3d 176] is directly on point. There, the City of Irvine approved a program EIR to develop a 7,743-acre site on 3,100 acres of "prime" agricultural land, though the EIR concluded the project would have "a 'significant unavoidable adverse impact' " on agricultural lands by taking 3,100 acres out of production. (*Id.* at pp. 1265, 1269.) The city considered but rejected as infeasible the purchase of offsite agricultural lands and the continued use of any part of the project site for agricultural purposes. (*Id.* at p. 1269.) The court concluded that substantial evidence supported the city's determinations, in part because of the "negative economics" of long-term agriculture in Orange County. (*Id.* at pp. 1269–1271.) "[I]ncreasing land prices and environmental regulation, higher water and labor costs, higher property taxes, competition from other parts of the state and foreign countries, and growing urbanization," the court said, supported the city's determination that the retention of onsite lands or the purchase of offsite lands for agricultural use was economically infeasible. (*Ibid.*)

Plaintiffs maintain that the "relevant question" concerning the feasibility of offsite land purchase and other measures to reduce the project's agricultural impacts was whether the net profits realized from the SCSP, which the EIR estimated to be over $32 million, would be sufficient to fund the purchase of offsite lands or similar mitigation measures. In support of this proposition, plaintiffs rely on this court's opinion in *Save Round Valley, supra*, 157 Cal.App.4th at pages 1461 and 1462, where we observed the settled principle

that a project *alternative* may properly be rejected as economically infeasible if "the reduced profitability of the alternative is ' "sufficiently severe as to render it impractical to proceed with the project." [Citation.]' [Citations.]" Citing this point, plaintiffs complain that "the EIR here provided absolutely no evidence or analysis whatsoever of the economic costs or profitability of the Project *with and without offsite mitigation*." (Italics added.)

Plaintiffs' reliance on *Save Round Valley* is misplaced. First, the case considered the feasibility of a specific project alternative, not an assortment of mitigation measures. (*Save Round Valley, supra,* 157 Cal.App.4th at pp. 1454–1465.) Moreover, the relevant inquiry concerning the economic feasibility of mitigation measures is not, as plaintiffs argue, whether the anticipated net profits from the project were sufficient to fund them. Rather, the relevant inquiry is whether such measures were *themselves* feasible. (*Concerned Citizens, supra,* 24 Cal.App.4th at pp. 840–842.) An analysis of the economic costs or profitability *of the SCSP*, "with and without" offsite agricultural mitigation, would not have assisted the City in resolving this question.

Nor is there any legal support for plaintiffs' assumption that any net profits from a project with significant environmental impacts must be used to fund measures to mitigate those impacts, or that the existence of net profits sufficient to fund a given mitigation measure renders the measure economically feasible. Neither *Save Round Valley* nor other case law supports this proposition, and it is based on flawed reasoning. Though some portion of the $32 million in anticipated net profits from the SCSP was ostensibly sufficient to purchase *some* offsite agricultural lands or fund similar mitigation measures, this does not mean that any such mitigation measures were economically feasible. To be sure, substantial evidence showed they were not, and plaintiffs advanced no evidence that they were.

Plaintiffs also argue that "time tested" and "legislatively approved" mitigation measures to reduce agricultural impacts were available but were ignored without explanation—including the purchase of offsite agricultural lands and the placement of the project site and offsite lands under agricultural easements or Williamson Act contracts. Not so. The EIR did not "ignore" these potential mitigation measures, but found such offsite measures economically infeasible and for this reason properly declined to analyze them in detail. (See *Concerned Citizens, supra,* 24 Cal.App.4th at pp. 840–842.)

Similarly, plaintiffs argue that state and local policy, reflected in the Agricultural Land Stewardship Program Act of 1995, the Williamson Act, and the 2003 County of Riverside General Plan, recognized the vital importance of agriculture and favored the preservation and expansion of agricultural land

uses. They fail to acknowledge, however, that CEQA does not require land to be placed under agricultural easements or Williamson Act contracts. Instead, CEQA requires that an EIR discuss and analyze *feasible* means of mitigating the project's environmental impacts, and here the EIR met this requirement.

Nor is the SCSP incompatible with the City's or the County's general plans, as plaintiffs suggest. (*California Native Plant Society v. City of Rancho Cordova, supra,* 172 Cal.App.4th at p. 636 [general plan is the " ' " 'constitution for all future developments' " ' " and decisions affecting land use depends on consistency with applicable general plan].) The City's general plan, approved in March 2007, acknowledged that "development pressures severely constrain the viability of agriculture as a continued or permanent use," and provided that the City would "support the maintenance of existing agricultural resources in the City *to the extent feasible*." (Italics added.) The City's general plan also called for the expansion of housing and commercial and industrial land uses. In addition, the County's general plan, which was not binding on the City, implicitly recognized that agriculture was being phased out on the SCSP site and surrounding areas because it designated the SCSP site as "Very Low density Residential uses," allowing for residential lot sizes of one acre or larger, with a "Community Development Overlay," allowing for higher housing densities under a specific plan, such as the SCSP.

C. *Alternatives to Reduce Agricultural Impacts*

Plaintiffs claim the City failed to proceed in a manner required by law because it limited the EIR's analysis of project alternatives to economically infeasible ones and rejected alternatives if they did not *fully* mitigate significant agricultural impacts. The question the EIR failed to address, they argue, "is what forms of agriculture would be viable onsite and what number of housing units would be both economical[ly] feasible and minimize significant [agricultural] impacts to the fullest extent possible." The EIR addressed this very question, however, in discussing a reasonable range of onsite project alternatives, several involving the continued use of all or a portion of the project site for agricultural uses. Each of these alternatives was considered economically infeasible, however, based on substantial evidence.

First, the draft EIR analyzed a "continued agriculture" alternative to lease the entire 200-acre project site for agricultural operations. Under this scenario, the site was valued at $2.553 million, less than its tax-assessed value of $3 million. For this reason, the City concluded that leasing the entire site for agricultural purposes would be economically infeasible. In responses to comments in the final EIR, the City also pointed out that the site could be used for dry farming and grazing once the egg farm facilities were removed and the site was "remediated" for hazardous materials. It was doubtful,

however, that the low profit margins generated from such operations would be sufficiently profitable to pay the costs of removing the egg farm facilities or remediating the hazardous materials.

Next, a "general plan" alternative would have constructed 180 residences on one-acre lots in accordance with the County's general plan. This alternative would have eliminated all agricultural uses on the site, while resulting in a financial loss of over $10 million. Similarly, the EIR considered a "limited development" alternative (Alternative 1) to construct 231 residences on one-half to one-acre lots on 160 acres, while keeping "essentially the same layout of roads, parks, and residential development" as the proposed project. Alternative 1 would have resulted in a financial loss of over $16 million, $6 million more than the general plan alternative.

The EIR also considered two alternatives involving continued agriculture uses on approximately 60 acres of the site, namely, "Alternative 2—Continued Agriculture—Clustered Development," and "Alternative 3—Modified Development Plan." In Alternative 2, 134 residences would have been built on one-half-acre to one-acre lots. Alternative 3 would have constructed 196 residences on lots ranging in size from 7,200 square feet to one acre. Alternative 3 was designed to eventually phase out the agricultural uses on the 60-acre portion of the site. Both alternatives involved placing a nine-acre landscape buffer between the 60-acre agricultural portion of the site and the residences. Alternatives 2 and 3 would have resulted in financial losses of over $10 million and $5 million, respectively.

Plaintiffs claim the EIR is legally deficient because it did not analyze a sufficient range of project alternatives involving the construction of "290 units, or any number of units between 231 and 560," because "this range was the only economically feasible range of housing units that would minimize the [SCSP's] significant [agricultural] impacts." We disagree.

■ As discussed, an EIR is not required to address every *"imaginable"* project alternative. (*Gilroy Citizens for Responsible Planning v. City of Gilroy, supra,* 140 Cal.App.4th at p. 935.) Instead, it is required to analyze a *reasonable range* of alternatives that could feasibly reduce a project's significant environmental impacts. (*Goleta Valley, supra,* 52 Cal.3d at pp. 565–566, 569.) "CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose." (*Id.* at p. 566.) The "key issue" is whether the range of alternatives discussed fosters informed decisionmaking and public participation. (*Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at pp. 404–405; Guidelines, § 15126.6, subds. (a), (f) [range of alternatives is governed by a "rule of reason"].)

" 'Absolute perfection is not required; what is required is the production of information sufficient to permit *a reasonable choice* of alternatives so far as environmental aspects are concerned.' [Citation.]" (*Village Laguna of Laguna Beach, Inc. v. Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1029 [185 Cal.Rptr. 41], italics added [Fourth Dist., Div. Two].) When an EIR discusses a reasonable range of alternatives sufficient to foster informed decisionmaking, it is not required to discuss additional alternatives substantially similar to those discussed. (*Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336, 1358–1359 [46 Cal.Rptr.3d 902]; *Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 491 [14 Cal.Rptr.3d 308].) The selection of alternatives discussed "will be upheld, unless the challenger demonstrates 'that the alternatives are manifestly unreasonable and that they do not contribute to a reasonable range of alternatives.' [Citation.]" (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 988 [99 Cal.Rptr.3d 572].)

The EIR is not legally deficient because it did not address a 290 residential unit alternative or any of the 328 imaginable alternatives involving the construction of anywhere between 232 and 559 residences, as plaintiffs claim. Though one or more of these 328 imaginable alternatives *may* have represented the optimum number of residences that could have profitably been built while minimizing the agricultural impacts of the project to the fullest extent possible, the range of alternatives discussed in the EIR was sufficient to foster informed decisionmaking on this very question.

In its final form, the SCSP proposed to build 560 units on the 200-acre project site at a net profit of $32 million. By contrast, the general plan and limited development alternatives would have built only 180 and 231 residences and would have lost more than $10 million and $16 million, respectively. And neither of these alternatives would have reduced the SCSP's agricultural impacts to any extent, even if they could have been profitably built. By contrast, Alternatives 2 and 3 would have set aside 60 acres for agricultural use, at least in the short term, but would have lost over $10 million and $5 million, respectively, while constructing 134 and 196 residences of increasing densities on fewer than 90 acres.

Alternative 3's comparatively lesser loss of over $5 million indicated there *may* have been an alternative that would have been profitable and that would have, at least to some extent, reduced the SCSP's agricultural impacts. This alternative would have involved building some number of residences in excess of 196—either by increasing the density of some or all of the residences, setting aside fewer than 60 acres for agricultural use, or both. But CEQA did not require the EIR to analyze a 290-residence alternative or any other alternatives along this continuum. The hypothetical alternative plaintiffs

imagine—the one that would maximize profit while reducing agricultural impacts to the fullest extent possible—could have been "intelligently considered" by studying the specifics and financial feasibility of the alternatives that were discussed. (*Village Laguna of Laguna Beach, Inc. v. Board of Supervisors, supra*, 134 Cal.App.3d at pp. 1028–1029.)

Plaintiffs also argue the EIR is legally deficient because it "virtually ignores any agricultural uses besides egg ranching," but the EIR belies this claim. The agricultural uses contemplated in Alternatives 2 and 3 were by no means limited to egg ranching, but contemplated "some type of agricultural use." Indeed, by the time the revised EIR was circulated in early 2006, the egg ranch had ceased operating and Sunny-Cal was in the process of removing the egg ranch facilities from the project site. The City thus reasonably concluded that another limited development alternative (not Alternative 1) that was considered in the draft EIR and that involved continuing Sunny-Cal's egg farm operations on part of the project site was no longer feasible.

Finally, plaintiffs argue there is no evidence to support the City's conclusion that all project alternatives involving agricultural uses only or a combination of agricultural uses and residential development were not economically feasible. Again, we disagree. Extensive financial analysis contained in the administrative record showed egg farming was no longer economically feasible on the project site, and each of the alternatives considered in the EIR that involved using the site exclusively for "some type" of agricultural use or a combination of agricultural use and residential development would lose money and were therefore economically infeasible.

## VI. ANALYSIS/THE STATEMENT OF OVERRIDING CONSIDERATIONS

■■■ "An agency must adopt a statement of overriding considerations when it approves a project in spite of significant, unavoidable environmental impacts . . . . (§ 21081, subd. (b); Guidelines, § 15093.)" (*Woodward Park, supra*, 150 Cal.App.4th at p. 717.) The statement reflects the "final stage" in the agency's decisionmaking process. (*Sierra Club v. Contra Costa County* (1992) 10 Cal.App.4th 1212, 1222 [13 Cal.Rptr.2d 182]; § 21081.) At least one overriding consideration must be stated for each of the project's significant and unavoidable environmental impacts. (§ 21081, subd. (b).)

"Overriding considerations contrast with mitigation and feasibility findings. They are 'larger, more general reasons for approving the project, such as the need to create new jobs, provide housing, generate taxes, and the like.' [Citation.]" (*Woodward Park, supra*, 150 Cal.App.4th at p. 717.) By contrast,

mitigation and feasibility findings " 'typically focus on the feasibility of specific proposed alternatives and mitigation measures . . . .' [Citation.]" (*Sierra Club v. Contra Costa County, supra,* 10 Cal.App.4th at p. 1222.) Overriding considerations are intended to show the "balance" the agency struck in weighing " the 'benefits of a proposed project against its unavoidable environmental risks.' [Citation.]" (*Ibid.*)

Like mitigation and feasibility findings, however, overriding considerations must be supported by substantial evidence in the EIR or elsewhere in the administrative record. (*Sierra Club v. Contra Costa County, supra,* 10 Cal.App.4th at p. 1223; Guidelines, § 15093, subd. (b).) A lead agency's decision to approve a project despite its significant environmental impacts is a discretionary policy decision, entrusted to it by CEQA, and will be upheld as long as it is based on findings of overriding considerations that are supported by substantial evidence. (*Towards Responsibility in Planning v. City Council* (1988) 200 Cal.App.3d 671, 685 [246 Cal.Rptr. 317]; *Sierra Club v. Contra Costa County, supra,* at p. 1224; §§ 21002, 21083.)

In the statement of overriding considerations, the City found the project had eight benefits, each of which "separately and individually" outweighed its unavoidable impacts. First, the City found the SCSP provided for a "high quality land use transition" from a closed egg ranch facility "to suburban land uses consistent with recent development in the surrounding area." Second, the project would reduce water demands in the SCSP area and "actually free[] up water rights for use." Third, the project would provide "sewer service in the area, which reduces the groundwater impacts from septic systems." Fourth, the project would "provide[] backbone public infrastructure (i.e., roads, secondary access, utilities) to serve [SCSP] residents and the surrounding community. . . . The backbone infrastructure will ensure that the residents of this Project do not adversely impact existing infrastructure. Additionally, residents in the City and the region will be able to utilize these roads as well as the proposed new parks."

Fifth, the City found "[t]he SCSP area when developed will provide for a high quality residential community that enhances the existing surrounding neighborhoods. . . . The SCSP area and the Project as a whole provides for a variety of housing types in different price ranges, allowing for a variety of homeownership opportunities. . . . Therefore, the proposed housing mix will allow for the creation of entry level, move up and executive type[s] of housing." Sixth, the project would include open space areas in excess of those required under current regulations. Seventh, the project would be sensitive to the environment, aesthetically pleasing, and place compatible land uses and facilities adjacent to each other. Eighth, and finally, the City

found that the enlargement of its sphere of influence would "allow for the orderly development of the area by having infrastructure within close proximity of it."

Plaintiffs claim the second overriding consideration or benefit of the SCSP—that it would reduce water demands in the SCSP area and free up water rights for others to use, is not supported by any evidence in the record. Recalling their baseline argument, they again argue the SCSP would result in a "ten-fold" increase in the amount of water used on the project site from 50 afa to 531 afa. They also point out that Sunny-Cal's water rights, most of which were not currently being used on the SCSP site, would "simply now be available for extraction by other parties." But this is precisely the point of the second overriding consideration—that the SCSP would free up water rights for others to use—and substantial evidence showed that most of Sunny-Cal's 1,484 afa entitlement to Beaumont Basin groundwater—over 900 afa—would be available for use by the BCVWD's other customers if the SCSP were built and used only 531 afa, as anticipated.

Plaintiffs next argue there was no evidence that the "backbone public infrastructure" of the SCSP would be needed if the SCSP were not built; that providing sewer service to the SCSP would extend to areas where septic systems were currently being used; or that there was any need for the SCSP's variety of housing types in different price ranges in view of the "tens of thousands of new homes already approved by the City." Substantial evidence showed, however, that each of these attributes of the SCSP would benefit members of surrounding communities as well as SCSP residents. At the very least, members of surrounding communities would be able to use the SCSP's roads and parks, and connecting sewer service to the SCSP would run sewer lines closer to the more rural areas of Cherry Valley where septic systems were still being used. And, though plaintiffs assert that the variety of housing types in the SCSP were not needed in view of the "tens of thousands of homes" the City had already approved, substantial evidence supports the City's contrary determination. The City's general plan called for encouraging the development of "new housing at varying densities to accommodate a variety of incomes and lifestyles," and the SCSP would provide a variety of housing types.

Finally, plaintiffs argue the City's other overriding considerations are "little more than statements of the Project's characteristics" and there is no evidence that "such routine development conditions can or should override" the SCSP's adverse environmental impacts. Indeed, the statement of overriding considerations accurately described the essential characteristics of the SCSP, and the City ostensibly determined that these characteristics were sufficiently desirable to override or outweigh the SCSP's adverse environmental impacts.

It is not this court's place to second-guess this discretionary policy determination, but to uphold it if substantial evidence supports its underlying findings. By plaintiffs' own admission, it does.

## VII. DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

Ramirez, P. J., and Richli, J., concurred.

A petition for a rehearing was denied December 17, 2010, and appellants' petition for review by the Supreme Court was denied February 16, 2011, S189450.